**BEN B. SCHWARTZ & SONS, INC., a Michigan corporation, Ben B. Schwartz, Samuel Schwartz and Barney Schwartz, Plaintiffs,**

**v.**

**SUNKIST GROWERS, INC., a California corporation, Defendant.**

**Civ. A. No. 18028.**

United States District Court
E. D. Michigan, S. D.

Feb. 10, 1962.

20. Cf. United States v. Tolub, 187 F.Supp. 705, 710 (S.D.N.Y.1960).

Edward M. Feeney, Marx, Levi, Thill & Wiseman, Detroit, Mich., for plaintiffs.

R. William Rogers, Dickinson, Wright, McKean & Cudlip, Detroit, Mich., Melville C. Williams and Karl D. Loos, Chicago, Ill., Pope, Ballard, Uriell, Kennedy, Shepard & Fowle, Chicago, Ill., of counsel, for defendants.

THORNTON, District Judge.

Plaintiff Ben B. Schwartz & Sons, Inc., is a Michigan corporation doing business in the City of Detroit, State of Michigan, and the individual plaintiffs, Ben B. Schwartz, Samuel Schwartz and Barney Schwartz, are citizens of the State of Michigan residing in Detroit. The defendant Sunkist Growers, Inc. is a corporation organized under the laws of the State of California and is authorized to do business in the State of Michigan. Its offices are located in the City of Detroit. Plaintiffs bring this action for damages for injury to their business by reason of acts and conduct by the defendant allegedly contrary to, and forbidden by, the anti-trust laws of the United States particularly, but not limited to, applicable portions of § 2 of the Robinson-Patman Act (15 U.S.C.A. § 13). This Court has jurisdiction herein. 15 U.S.C.A. § 15. The complaint alleges that for more than four years prior to October 1, 1955 plaintiffs Ben B. Schwartz, Samuel Schwartz and Barney Schwartz, as partners, were engaged in the wholesale produce business in Detroit, said business being conducted under the name and title of Ben B. Schwartz & Sons, the business address being at the Detroit Produce Terminal. The aforesaid organization was incorporated as of October 1, 1955 as Ben B. Schwartz & Sons, Inc., at which time the business of the partners was taken over by the corporation and since that time has been conducted as a corporation. A substantial portion of the business over the four-year period mentioned herein was the buying of citrus fruits from growers, their agents and representatives, and the selling of such fruits at wholesale to retailers and distributors throughout the City of Detroit and adjacent areas. During this four-year period the defendant Sunkist was the exclusive distributor of California citrus fruits bearing the brand or trade-mark name of "Sunkist". Plaintiffs further allege that the "Sunkist" brand of citrus fruits is the most widely known and popular brand of citrus fruits sold in the United States. Plaintiffs further allege that during the period covered by the complaint the defendant has sold "Sunkist" citrus fruits in car lots to a certain few dealers in citrus fruits in the Detroit trading area, and that during the same period defendant has refused to sell the said "Sunkist" fruits in car lots to plaintiffs, although plaintiffs over a long period of time have on a number of occasions sought to purchase "Sunkist" citrus fruits from defendant in car lots. Plaintiffs allege that they are one of the largest dealers in citrus fruits in the Detroit trading area, and that their facilities for handling and storage of citrus fruits are equivalent to those possessed by those buyers to whom sales in car lots have been made by the defendant. Plaintiffs further allege that because of their inability to purchase "Sunkist" citrus fruits from defendant in car lots, they have been required to obtain said citrus fruits at auction sales conducted by an agent of the defendant known as the Detroit Fruit Auction Company, a Michigan corporation, further alleging that the failure of the defendant to sell the said "Sunkist" citrus fruits in car load lots direct to plaintiffs while selling them to certain other buyers in the Detroit trading area has been and is a discrimination prejudicial and damaging to plaintiffs, con-

trary to the anti-trust laws of the United States. They further identify the alleged discrimination in particular, as follows:

"(a) In requiring the plaintiffs to purchase 'Sunkist' brand citrus fruit at said auction, the plaintiffs have been and are being made subject to the day to day vicissitudes of the market, which frequently has resulted in them paying a higher price for citrus fruit than that paid at the time by the favored car lot buyers. Further, by reason of this, plaintiffs have been and are unable to purchase at any determined price for later delivery and hence unable to quote any firm advance prices to customers, as they would have been able to do and could now do if permitted to order for direct delivery to them in car lots. All of the foregoing has decreased materially profitable sales of 'Sunkist' brand citrus fruit, a favored brand as previously stated, by plaintiffs to their customers, who compete in the sale of 'Sunkist' brand citrus fruits with the favored buyers from the defendant.

"(b) On all sales by the defendant at auction through the Auction Co., purchasers, including plaintiffs, have been required to pay five cents (5¢) per box in addition to the sale price for the 'Sunkist' brand citrus fruit, this five cents (5¢) per box being the fee or commission to the Auction Co., thus forced on to the buyers by the defendant. The result has been a further increase in cost of 'Sunkist' brand citrus fruit to plaintiffs over that paid by buyers who have been and are accorded the discriminatory privilege, by defendant, of buying from them in car lots, to the prejudice and damage of the plaintiffs.

"(c) By reason of being required to buy at auction through the Auction Co., the plaintiffs have been and are being forced to expend not less than ten cents (10¢) per box of 'Sunkist' brand citrus fruit for handling charges and expenses in then transporting the items purchased from the Auction Co., premises to their premises and for other miscellaneous expenses attendant thereto, which car lot buyers avoid and which plaintiffs would have been avoiding had they been privileged to buy directly in car lots; hence the result is a still further increase in cost of 'Sunkist' brand citrus fruit to plaintiffs above the cost thereof to favored car lot buyers."

As a result of the foregoing, plaintiffs allege that they have been forced to accept a substantially decreased profit margin by reason of the alleged unlawful discriminatory sales policy and conduct of defendant, and claim that the injury and damage they have suffered have been not less than the sum of $50,000 and therefore request the following relief:

"(a) That the defendant be enjoined from continuing or practicing any discriminatory sales policy or practice against the plaintiff Ben B. Schwartz & Sons, Inc., a Michigan corporation, and in particular from refusing to sell and deliver 'Sunkist' brand citrus fruit in car lots to said plaintiff, upon the same terms and conditions as they may be sold and delivered to any other purchaser from the defendant.

"(b) That the plaintiffs recover an amount not in excess of Two Hundred Thousand Dollars ($200,-000.00) as their damages resulting from the past discriminatory practices of the defendant.

"(c) That the plaintiffs recover proper court costs and attorney fees."

The defendant denies liability in any degree and alleges that it is and at all times mentioned in the complaint has been a non-profit agricultural cooperative marketing association without capital stock, with its principal place of business in Los Angeles, California; that it was and is organized and instituted for the

purpose of mutual help and benefit of its members as producers of agricultural products; that it was not and is not conducted for profit; that it did not and does not pay any dividends or interest on membership capital; that it did not and does not deal in products of non-members in an amount greater in value than such as are and were handled by it for its members; that it is now and for many years has been the marketing agent in the Detroit trading area for the "Sunkist" brand citrus fruits of its members. Defendant further alleges that car lot sales of "Sunkist" brand citrus fruits have been made in the Detroit trading area only to retailers and that no such sales have been made to jobbers or other wholesalers; that defendant, acting on behalf of its members, has refused requests of plaintiffs that "Sunkist" citrus fruits be sold direct to plaintiffs alleging that plaintiffs are jobbers or wholesalers, further alleging that "Sunkist" brand citrus fruit has been regularly offered for sale at the auction conducted each business day by the Detroit Fruit Auction Company to all who attend the auction, regardless of whether they are jobbers or wholesalers, or are retailers, and that plaintiffs herein have purchased "Sunkist" citrus fruit at this auction from time to time. Defendant alleges that the Detroit Fruit Auction Company requires all purchasers of citrus fruit and other products, including these plaintiffs, to pay 5¢ per box in addition to the sale price for the services rendered by the Detroit Fruit Auction Company to the purchasers. Defendant admits that plaintiffs have complained to it that they were unable to purchase "Sunkist" citrus fruits direct from defendant. Eight additional defenses are alleged by defendant to plaintiffs' complaint. In relation to the "Eighth Defense" defendant alleged as follows:

"Defendant is a cooperative corporation meeting both the requirements of Section 6 of the Clayton Act, 15 U.S.C. § 17, and those of the Capper-Volstead Act, 7 U.S.C. §§ 291, 292; and its claimed violation of law is exempted from the antitrust laws by said statutes."

The progress of the within matter was held up awaiting a determination of the United States Supreme Court, which determination has rendered nugatory defendant's "Eighth Defense." This is conceded by defendant.

During the pendency of this action four pre-trials were held in an effort to have the matter submitted factually by stipulation and/or to define the issues to be determined by the trial. These conferences were conducted on the assumption that plaintiffs were proceeding under § 13(a) of Title 15 U.S.C.A. and that defendant was prepared to defend this type of action. However, during the course of the pre-trials plaintiffs "changed horses in the middle of the stream" and announced that they were proceeding under the provisions of § 13(e) of the same title, which is as follows:

"(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

and as of January 17, 1961 plaintiffs made the following concession:

"Assuming that the word 'facilities' as used in Section 2(e) of the Robinson-Patman Act refers only to a physical facility, such as a warehouse, then our position is that the discrimination alleged involves services furnished by the defendant to certain purchasers of its products and not furnished on an equal basis to the plaintiff. More specifically, these services are concerned with the ability of certain customers to .

purchase citrus fruits from the defendant in two ways: (1) directly in carload lots, and (2) at the Detroit Fruit Auction, whereas the plaintiff can purchase Sunkist products only through the Detroit Fruit Auction. * * * "

The Detroit trading area has been defined as including the counties of Wayne, Macomb, Oakland, Washtenaw and Monroe, all in the State of Michigan.

The dealers referred to in plaintiffs' complaint as buyers of car lots of "Sunkist" citrus fruits by direct sale from the defendant are the large chain grocery stores operating in the Detroit trading area and they are further identified as the A & P Food Stores, Kroger Company, Wrigley Super Markets, National Food Stores and Food Fair Markets.

Plaintiffs represent that the damages as a result of their complaint are represented by 211,803 packages of "Sunkist" citrus fruits at 15¢ per package—5¢ as an auction charge and 10¢ as an additional overhead charge to plaintiffs. They allege that the 10¢ charge was incurred because it was necessary to truck and transport the "Sunkist" citrus fruits purchased by them from the Detroit Fruit Auction to their place of business in the Detroit terminal. Plaintiffs ask treble damages in the amount of $95,311.-35.

Plaintiffs further state that the 15¢ per package charge on purchases made by plaintiffs at the Detroit Fruit Auction for "Sunkist" citrus fruit was passed on to the customers.

At the trial of this cause Barney Schwartz testified that he was a member of the firm of Ben B. Schwartz & Sons in the business of wholesale produce, handling carload lots of perishable produce which include citrus fruits further identified as oranges, grapefruit, tangerines and all other varieties of citrus fruits that are grown in any state of the United States. He testified that as part of their terminal facilities they have a spur track for the purpose of handling produce directly from a freight car, side-tracks being approximately 200 yards away from their warehouse facilities, the same being used for direct transfer from the freight cars without being unloaded at the Schwartz warehouse; this is the method by which the bulk of the produce purchased by Schwartz is handled by the firm; sales of their products are generally consummated on the floor of their warehouse by personnel hired for that express purpose; in addition, the firm employs stevedore help whose function is to move and unload all the produce purchased by plaintiffs and sold through their warehouse facilities; generally the firm purchases direct from the producer, or from the agent of the producer, sometimes handling produce on consignment and at other times purchasing at auction, all depending upon market conditions. Mr. Schwartz considered a direct purchase to be one which is made from anyone whose primary business is the selling of carload lots of fruits and vegetables grown either by himself or as a sales agent for a grower or a group of growers. (There are very few growers who are large enough to employ a regular sales agent for carloads of merchandise, it being the general practice to handle the sales through a cooperative agent). A consignment sale is one in which his firm handles the produce for a grower or his agent on a consignment basis—his firm will sell the produce, deduct its commission and remit the balance to the grower. A purchase at auction is one in which his firm buys the fruit that is consigned to the auction by bidding at the auction. If successful his firm removes the produce to its place of business and re-sells it from that point, which is part of the terminal that embraces his business facilities.

In relation to citrus fruits Ben B. Schwartz & Sons, Inc. makes sales to retailers, to secondary jobbers and to wholesalers, including those who are too small to buy carloads of their own, and to customers who are temporarily in short supply. In this way the firm disposes of the citrus fruits it purchases direct. It also disposes of the citrus

fruits it purchases on a consignment basis to the same category of purchasers. This type of purchaser is also included in the sale of the citrus fruits purchased by the Schwartz firm at auction. The customers who purchase the citrus fruits from the auction are for the most part smaller customers of Schwartz. The auction sale at the fruit terminal is conducted daily Monday through Friday.

Mr. Schwartz further testified that he has purchased citrus fruits offered by the Sunkist Growers, Inc. through the aforesaid Auction Company; that he has repeatedly requested Sunkist Growers, Inc. both orally and in writing to purchase citrus fruits direct from the Sunkist Growers, Inc. with negative results. He identified the persons or firms in the Detroit area who purchase citrus fruits direct in car lots fom Sunkist Growers, Inc. as the A & P, Kroger, Wrigley, National and Food Fair. He stated that the Schwartz firm uses the Detroit Fruit Auction Company as a buyer. In buying carload lots of citrus fruits it deals with the Detroit Fruit Auction Company as both an agent and as an owner. The underlying reasons which lead the Schwartz firm to purchase a carload of oranges, lemons or grapefruit at any particular time are that at all times it considers it good business to have a stock of fruits and vegetables that are part of its regular line of trade and in the exercise of its judgment it will buy fruit on which it believes it can make money, and also for the reason that the firm can in this way take better care of its customers. In addition, in the exercise of its market judgment, it will buy more heavily when the market looks as if it may advance, and will try to buy as lightly as possible when the market looks poor; that purchasing direct in carload lots is the backbone of the business of the Schwartz firm as it views its entire business as one of carload distribution, buying car lots and selling to those customers who are not large enough to buy car lots or to those carload buyers who have not had the good fortune to have their supply on hand when they need it; that there

have been occasions when the Schwartz firm has sold citrus fruits, including "Sunkist" products to A & P. On all occasions the quantity of citrus fruits sold by the Schwartz firm to A & P has been as large as a carload lot, and on some occasions as much as two cars of citrus fruits; that the Schwartz firm has received California and Arizona citrus fruits by purchase of them through sources other than the Detroit Fruit Auction Company, some having been purchased direct while some has been brought in on consignment, and that the Schwartz firm has sold California and Arizona citrus fruits through the Auction Company as a broker for the Mutual Orange Distributors. The fruit line of this distributing company includes California and Arizona lemons and grapefruit as well as oranges; that the citrus fruit sold by the Mutual Orange Distributors has the trade name of "Pure Gold", and that the "Pure Gold" line of citrus fruits is in competition with the "Sunkist" line of citrus fruits. The "Pure Gold" line of citrus fruit is of the same general quality as the "Sunkist" citrus fruits. Mr. Schwartz further testified that his firm sold more "Pure Gold" citrus fruit products than "Sunkist" citrus fruit products (the ratio being 10 to 1), selling the "Pure Gold" line to the same customers as those to whom Sunkist sold its "Sunkist" line.

Mr. John Palmer testified that he had been associated with the Detroit Fruit Auction Company for 42 years and was presently the senior auctioneer and general manager of his company in relation to its fruit operation. He testified that the car of fruit is placed on the company's railroad siding, is unloaded and put on the floor according to the manifest, after which the employees of the Auction Company open these boxes for display. The manifest indicates the size of the cartons and/or boxes as well as the number of boxes of each brand. At this time buyers inspect the fruit and mark the catalogues which have been issued the previous day and which are available to the buyers early in the morning of

the day the fruit is to be sold at auction, the sale starting at 9 o'clock in the morning. Each carload of fruit is offered separately at the auction. These cars are given to the Auction Company on the day previous to the auction. Some cars are in town and some are rolling. There are times when the railroad is late in delivering the cars, for various reasons, but if the contents of any particular car are catalogued and the car arrives late, if there is an opportunity to display the contents they are placed on the floor. The information as to the arrival of the railroad cars used in transporting the fruit is furnished to the Auction Company by the owner of the load contained in the car. The Auction Company does not order anything and does not own any merchandise that is sold by it. On each occasion, when a carload of fruit is offered for sale by the owner, a representative of the owner of the contents of the car is standing next to the auctioneer to watch the bidding on the fruit in which he is interested. If the bidding on the particular shipment is below what the owner believes to be a fair market price he, the owner, can temporarily withdraw his line which is being held out for bid and sale, the owner of the merchandise being the one who determines what the fair market price should be. Any fruit which is not sold on a particular day is put up for sale the following day and must be sold at that time. The Auction Company makes a service charge of 5¢ a package on every package of fruit sold through the auction. The Auction Company maintains its own credit system whereby some buyers pay cash, some have a 24-hour credit, some are on weekly credit. There is a requirement that each buyer submit a financial statement to the Auction Company if he desires to buy on credit. His credit must be approved by the Auction Company, not by the owner of the fruit. The Auction Company is open to any and all, whether buying on credit or for cash. The Auction Company charges the owner a commission on the fruit sold through the auction and bears all losses as the result of any credit extended by it. The 5¢ service charge to the buyers is payment for substantial services rendered by the Auction Company to the buyers and there are many advantages in buying citrus fruits through the Auction Company

Representatives of the Fruit-Buying Divisions of A & P, Kroger, Wrigley, National and Food Fair appeared as witnesses and testified substantially that fruit is purchased either through a central purchasing agency of the chain store or by a direct contact with Sunkist in the Detroit area or by contact with the Sunkist organization in California; that the fruit is shipped to the warehouse of the respective chain stores where it is inspected prior to acceptance. If satisfactory the fruit is unloaded in a particular warehouse for distribution to the store, the unloading being done by employees of the respective chain stores. It is then distributed to the retail stores in trucks owned by the chain store organization, some of the fruit being kept on hand as surplus in the warehouse. The billing and the collecting operation for the fruit sent out to the respective chain stores is processed through the accounting departments of the respective chains. The only advantage in buying direct in carload lots is that the chain stores are afforded a consistent supply by buying at the point of shipment rather than by buying locally in a fluctuating market. Buying direct in carload lots enables the buyer to know what the merchandise is going to cost at the time it is shipped and that enables the chain stores to set up their sales program (shipments taking about six running days' time from California, the point of shipment, to Detroit). The citrus fruits purchased by the chain store organizations are never delivered to any retailer who may be in competition with the respective chain stores. The "Sunkist" citrus fruits are never sold to anyone by the respective chain stores except their own retail customers through their own stores.

Mr. Martin R. Warshaw identified himself as an assistant professor of marketing, School of Business Administration, at the University of Michigan. He testified that he had had eight years' experience in the chain jewelry business before becoming affiliated with the University of Michigan. He qualified as an expert in the marketing field and identified particularly the A & P as a "vertically integrated" retail chain. This he defined as a business organization, the major portion of whose activities is directed toward retailing to the consumer, but which also performs other functions, notably wholesale functions, the ownership of all departments of this business being common. In other words, the stockholders of the A & P Company own the entire organization, which functions as both wholesaler and retailer. He further testified that all the chain store organizations heretofore mentioned perform typically wholesale functions, and that plaintiffs operate as primary distributors of fruits and vegetables; they perform essentially the same functions as chain warehouses but do not perform all of them. One difference is that the plaintiffs have to find their customers and sell to them, while a chain store organization has the advantage of having "captive customers, their own units; they don't have to sell." He stated that there were some other differences in the operation of the chain store organization as compared to the plaintiffs' operation.

The preceding analysis of and references to various parts of the testimony provide the factual basis for the conclusion we reach. We conclude that the alleged violations of 15 U.S.C.A. § 13(e) are not within the purview of said statute. The prohibition contained in the statute is therein stated to be discrimination "in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale * *." The balance of § 13(e) describes the proscribed manner of discrimination. How can plaintiffs rely upon the *manner* of discrimination for their cause of action without preliminarily establishing that they are purchasers? The testimony not only fails to establish that plaintiffs are purchasers from defendant but establishes positively that they do not purchase from defendant. That is one of their complaints—that defendant refuses to sell to them. Chief Judge Biggs states unequivocally that one must be a direct purchaser to be entitled to protection under the Act. Klein v. Lionel Corp., 3 Cir., 1956, 237 F.2d 13. This seems to us to be in accord with the plain language of this section of the Act. We conclude that plaintiffs are not purchasers within the meaning of 15 U.S. C.A. § 13(e). As to the right of defendant to refuse to sell directly to plaintiffs, Judge Moore's opinion in Atalanta Trading Corp. v. Federal Trade Commission, 2 Cir., 1958, 258 F.2d 365, 372–373, contains the following language: "Nothing in the Robinson-Patman Act imposes upon a supplier an affirmative duty to sell to all potential customers. Absent monopolistic power, a seller may refuse to deal with anyone. * * * All that the Act requires is that a seller give fair and equal treatment to all those to whom he elects to sell products of like grade and quality." We are in accord with the foregoing conclusion as to the duty and requirement of the Act.

For purposes of completeness we cite Skinner v. United States Steel Corp., 5 Cir., 1956, 233 F.2d 762, 765–766 for the reason that plaintiffs advance the somewhat tenuous theory that the "services or facilities" recited in the Act can be interpreted as referring to the conduct of a seller in permitting or refusing to permit a potential purchaser to become an actual purchaser. The Skinner case stands for the proposition that "the services or facilities that must be made available on proportionally equal terms to all purchasers in competition are *merchandising* services or facilities." (Emphasis supplied.)

Also in the interest of completeness, although going to the issue of damages which issue we do not reach because of our conclusion of non-liability, we conclude that the only proper formula for

determining damages (if in fact the alleged violations were actionable) would be one based upon the difference between what plaintiffs paid for the commodity at auction and what they would have paid at direct sale at the same times for merchandise of like grade and quality. There was no testimony adduced that would supply the figures necessary in the employment of such a formula, nor was there any testimony that such figures were (or would be) difficult of ascertainment.

A judgment in conformance with this opinion may be presented.