**SHREVEPORT MACARONI MANUFAC- TURING COMPANY, Inc., Petitioner.**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 19578.

United States Court of Appeals Fifth Circuit.

July 18, 1963.

Robert G. Pugh, Shreveport, La., for petitioner.

J. B. Truly, Asst. General Counsel, F. T. C., Charles C. Moore, Jr., Atty., James McI. Henderson, Gen. Counsel, J. Lane Morthland, Atty., F. T. C., Washington, D. C., for respondent.

Before RIVES, LEWIS,* and BELL, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge.

Petitioner seeks to set aside a cease and desist order entered against it by the Federal Trade Commission in the proceeding entitled In the Matter of Shreveport Macaroni Manufacturing Company, Inc., Docket No. 7719, before the Federal Trade Commission. Our jurisdiction is based on 15 U.S.C.A. § 21(c) and 15 U.S.C.A. § 45(c).

The complaint of the Commission commencing the proceeding alleged in paragraphs 1, 2, and 3 that Shreveport Macaroni was a corporation organized, existing and doing business under and by virtue of the laws of the State of Louisiana with its principal place of business in Shreveport, Louisiana; that

* Of the Tenth Circuit, sitting by designation.

it was engaged in manufacturing and selling noodles, spaghetti, macaroni, and related items to retail chain store organizations, independent grocery stores, and wholesalers in the States of Louisiana, Texas, Arkansas, Mississippi, Tennessee and Oklahoma with sales exceeding $240,000 during the year 1958; and that in the course and conduct of its business it had engaged in commerce as that term is defined in the Clayton Act, as amended, in that its products were sold and transported from Louisiana to customers located in other states of the United States. These allegations were admitted.

Paragraphs 4, 5, and 6 of the complaint were denied. These, in substance, charged that Shreveport Macaroni in the course and conduct of its business in commerce made payments to some of its customers for services furnished by them in connection with their sale of products sold to them by Shreveport Macaroni, and that such payments were not made available on proportionally equal terms to all other customers competing in the sale and distribution of these products. In specifics it was alleged that during 1958 Shreveport Macaroni paid Childs Big Chain of Shreveport, a division of the Kroger Company, $1,900 as compensation or as an allowance for advertising or other services of facilities furnished by or through Childs in connection with its sale of products sold to it by Shreveport Macaroni, and that such compensation was not offered or otherwise made available to other customers

competing with Childs in the sale and distribution of products of like grade and quality purchased from Shreveport Macaroni, and that these acts and practices violated § 2(d) of the Clayton Act, as amended by the Robinson-Patman Act. 15 U.S.C.A. § 13(d).[1]

Shreveport Macaroni also plead affirmatively that the allowances it had made available to its customers were made in good faith to meet allowances furnished by a competitor, cf. 15 U.S.C.A. § 13(d), but this defense was not pursued.[2] On the hearing, the Commission introduced its evidence and Shreveport Macaroni, choosing to rely on the contention that the Commission had not made out a prima facie case, offered no evidence and moved for dismissal. The motion was overruled and the hearing closed.

The case comes to us from the final order of the Commission adopting the decision of the Hearing Examiner that § 2(d) of the Act was violated in 1958 and 1959 by payments to two customers, Childs Big Chain and J. Weingarten, Inc., when such payments were not made available on equally proportionally terms to other customers of Shreveport Macaroni. Petitioner contends that there was a total absence of competition in interstate commerce between the favored and unfavored customers, and for that reason the order cannot stand.

With respect to Weingarten, the facts show that it was headquartered in Houston, Texas. It had thirty nine retail grocery stores in Texas and Louisiana.

1. "It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

2. At the hearing the Examiner requested the name of the competitor and counsel for Shreveport Macaroni replied that the defense might be waived or that it might be developed during the hearing. The Examiner asserted that a good faith meeting of competition was not a defense in a § 2(d) case. This transpired on November 9, 1960 and since then the courts have ruled otherwise. See Exquisite Form Brassiere, Inc. v. Federal Trade Commission, 1961, 112 U.S.App.D.C. 175, 301 F.2d 499, cert. den., 369 U.S. 888, 82 S.Ct. 1162, 8 L.Ed.2d 289; and Shulton, Inc. v. Federal Trade Commission, 7 Cir., 1962, 305 F.2d 36.

but purchased the products of Petitioner for sale only in certain of the Louisiana stores. The purchases were made from Houston but the deliveries were to the designated stores in .Louisiana. There was competition inside but none outside the State of Louisiana between stores of Weingarten and other customers of Petitioner. On four occasions in 1958 and 1959, Weingarten solicited Petitioner from its Houston office to participate in special promotional sales by contributing to newspaper advertisements, with a choice being given as to newspapers in various areas of Texas and Louisiana. Petitioner chose to participate to the extent of paying for or toward an advertisement to appear in a Shreveport, Louisiana newspaper and contributed $106.01 on three of the occasions, and $107.51 on the other. It is undisputed that the same type products of Petitioner were sold in the stores of all its customers and that the allowances made to Weingarten and Childs were not made to other customers of Petitioner, whether within or without the State of Louisiana.

Childs Big Chain, a division of Kroger Company, had its general office in Shreveport, Louisiana. It had stores in Louisiana, Texas, and Arkansas. Effective January 1, 1958, Petitioner agreed to pay Childs an advertising allowance of ten cents per case on macaroni and egg noodles based on yearly purchases of nine thousand cases or more. Childs was the only customer in 1958 or 1959 whose purchases met this standard, and was paid $996.10 in 1958 and $649.70 in 1959, with an additional $176.10 being, at the time of the hearing, due for the last quarter of 1959.

In addition to these payments, Childs solicited Petitioner for a special advertising allowance in 1958 by way of participation in an anniversary sale to be conducted throughout its organization. The solicitation contained several offers and Petitioner chose proposition No. 5 at a cost of $887.00. It included the featuring of Petitioner's products in advertisements appearing on seven consecutive days in seven major papers in Louisiana and Texas, on four radio spots per day for seven consecutive days and on one television program, together with a display in all thirty three stores of Childs.[3] Thereafter, in 1959, Petitioner participated in a sales plan offered by Childs which it called its television package deal and for which Petitioner made four advertising allowance payments of $120.00 each. This at least included the advertisement of Petitioner's products over Station KLTV, Tyler, Texas.

All products purchased by Childs from Petitioner were delivered to the Childs warehouse in Shreveport, but some were from there shipped by Childs to Tyler, Texas for sale in its stores there. This is the only evidence of interstate commerce in the record as it pertains to Petitioner's products, whether sold to Weingarten or Childs. Again, as with Weingarten, there was no proof of competition between the stores of Childs and other customers of Petitioner in the sale of products of Petitioner outside the State of Louisiana but there was an abundance of proof of competition within Louisiana.[4]

■ It was admitted that Petitioner was engaged in interstate commerce. Weingarten and Childs were engaged in interstate commerce. The payments to Weingarten were solicited and paid in interstate commerce. The purchases by Weingarten were from its Houston office and in interstate commerce although the deliveries and retail sales were intrastate. The No. 5 promotion of Childs paid for by Petitioner was in interstate commerce at least to the extent of the newspaper advertisements, and this was true with regard to the television program in Tyler, Texas. The advertising allowance was on products purchased in Louisiana but some of which were

---

3. The radio and television area was not stated.

4. Sales were made by Petitioner to wholesalers or jobbers in Beaumont and Tyler, Texas but not to retailers.

shipped to Tyler, Texas by Childs for resale there. There was competition between the favored and unfavored retailers in Louisiana. Stated differently, we have a manufacturer engaged in interstate commerce making an allowance to two food chain customers who are also engaged in interstate commerce in connection with products sold only in intrastate competition, but with the allowance being made or used in interstate commerce. This, we think, meets the test of the statute that the allowance payments be made in the course of the commerce that Petitioner was engaged in at the time.

This is clear from the language of § 2(d). It is unlawful for any person engaged in commerce [Petitioner] to pay to a customer [Weingarten and Childs] in the course of such commerce as compensation for any services furnished by the customer [Weingarten and Childs] in connection with the resale by the customer of the goods of such person [Petitioner], unless such payment is available on proportionally equal terms to all other customers competing in the distribution of such products.

But, argues Petitioner, the Act does not apply where the competition in sales is purely intrastate, and thus jurisdiction under the Act which applies only to commerce as it is defined in § 1 of the Clayton Act, 15 U.S.C.A. § 12,[5] is lacking. But commerce as there defined is fully met by the facts in this case.

Petitioner relies on the authority of treatises to make this point. Congressman Patman, a co-author of the Act, states that § 2(d) is applicable if it "can be shown that the goods purchased by 'either or any' of the competing customers were sold in interstate commerce." Patman, Complete Guide to the Robinson-Patman Act, (1963), p. 132. Rowe, Price Discrimination under the Robinson-Patman Act (1962), p. 393, goes into this question and comments that a promotional payment becomes amenable to

§ 2(d) by virtue of its connection with a sales transaction which is governed by the Robinson-Patman Act. Accordingly, he notes, the jurisdictional status of a promotional arrangement is derivative from the sale to which it is appended, apart from the special requirements of § 2(d) which presuppose a supplier engaged in commerce and a promotional discrimination in the course of such commerce. The section is applicable so long as the transaction, and we suppose this means sale, with either the favored or the competing disfavored customer crosses a state boundary. See also Austin, Price Discrimination under the Robinson-Patman Act (1953), pp. 117, 118.

Here the product sold to Childs crossed the state line into Texas for resale, and this was sufficient to give the Commission jurisdiction over the alleged discriminatory allowances even under these authorities. Cf. Standard Oil Company v. Federal Trade Commission, 1951, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239, on the stream of commerce theory. And it may be that these learned authorities have stated a correct rule as to a minimal contact or connection with interstate commerce.

However, we do not think this section of the Act can be so narrowly read either from its plain language, or in the light of the legislative history as to make such a requirement a *sine qua non* of applicability. See Patman, Guide to the Robinson-Patman Act, supra, for a compilation of the legislative history.

The purpose of the Act was to protect small merchants from discriminatory practices at the hands of manufacturers or suppliers favoring large purchasers. The discrimination here was in the course of interstate commerce. It ran from one engaged in interstate commerce to others engaged in interstate commerce. It favored interstate chain operators in their whole business including their intrastate competition with grocerymen in Louisiana in the sale of

---

5. " 'Commerce,' as used herein, means trade or commerce among the several States and with foreign nations, * * *."

Petitioner's products who were not offered allowances on proportionally equal terms. The allowances were effected through the utilization of interstate mechanisms. The power to regulate interstate commerce includes limiting "its employment to the injury of business within the State, * * *." Moore v. Mead's Fine Bread Co., 1954, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145; and Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162. We do not read the statute to qualify payment in the "course of * * * commerce," once that appears, by a further requirement that the payment be in connection with goods sold in interstate commerce, resold in interstate commerce, or that the competition between competing customers be in interstate commerce where there is ample nexus to interstate commerce in the whole transaction as here. There is no warrant in the law for any such fragmentation. On the question of jurisdiction see the somewhat analogous case of Corn Products Refining Co. v. Federal Trade Commission, 1945, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320, where an interstate manufacturer violated § 2(e) by furnishing advertising services in intrastate commerce favoring an intrastate purchaser who did interstate business and competed in interstate commerce with unfavored interstate purchasers, and where the advertising was in interstate commerce. Jurisdiction there was to protect interstate commerce from an intrastate discrimination. Here it is to protect intrastate commerce from an interstate discrimination, a situation not wholly unlike that in Sun Cosmetic Shoppe, Inc. v. Elizabeth Arden Sales Corporation, 2 Cir., 1949, 178 F.2d 150, 13 A.L.R.2d 358. See also In the Matter of J. H. Filbert, Inc., 1957, 54 F.T.C. 359. The allowances under these facts constituted violations of § 2(d) of the Act.

█ Petitioner also claims that the challenged transactions are de minimis, citing Skinner v. United States Steel Corporation, 5 Cir., 1956, 233 F.2d 762.

See also E. Edelmann & Co. v. Federal Trade Commission, 7 Cir., 1956, 239 F. 2d 152. Childs was the largest customer of Petitioner while Weingarten was the next to the largest. There is nothing in the record whatsoever to indicate that the total allowance to Childs of $1,883.10 in 1958 and $1,129.70 in 1959 was negligible or inconsequential in the sense of being de minimis, and the same is true as to the Weingarten allowances. There is substantial evidence to the contrary. Keele Hair and Scalp Specialists, Inc. v. Federal Trade Commission, 5 Cir., 1960, 275 F.2d 18.

The petition to review and set aside the cease and desist order of the Commission is denied, and the order will, pursuant to statute, be enforced. 15 U.S.C.A. § 21(c).

Enforcement ordered.