**L & L OIL COMPANY, INC.,**
**Plaintiff-Appellant,**

v.

**MURPHY OIL CORPORATION,**
**Defendant-Appellee.**

No. 81–3175.

United States Court of Appeals,
Fifth Circuit.

May 7, 1982.

---

William M. Lucas, Jr., New Orleans, La., for plaintiff-appellant.

William R. Pitts, Joe B. Norman, New Orleans, La., for defendant-appellee.

Before TATE, SAM D. JOHNSON and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This case arises out of Murphy Oil Corporation's drastic reduction and eventual termination of sales of No. 2 diesel fuel to L&L Oil Company. L&L filed suit against Murphy alleging violations of §§ 2(a) and (e) of the Clayton Act as amended by the

Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13 *et seq.* The district court dismissed L&L's suit for failure to state a claim upon which relief could be granted.

In reviewing this action, the facts as alleged in L&L's complaint are taken as true. Murphy is a manufacturer, refiner and distributor of diesel fuel. L&L is engaged in the business of supplying diesel fuel to inland and offshore oil rigs. L&L began purchasing some, but not all, of its No. 2 diesel fuel from Murphy in 1976, and by January of 1979, L&L was purchasing up to 80% of its fuel from Murphy.

Because of the well-known energy shortage, Murphy began in March, 1979, making severe reductions in the quantity of its sales to L&L. In the event of an energy crisis, the custom in the petroleum industry was for a supplier like Murphy to reduce proportionately the quantities sold to all of its customers based upon the quantity the customer bought the previous year in the same month. Instead of following this practice, Murphy drastically reduced the quantities of fuel available to L&L while continuing to supply a high percentage of the needs of other customers. Murphy said it was allocating fuel in this manner because L&L had "shopped around" when fuel was plentiful while other customers remained loyal.

In addition to the quantitative reduction, L&L was required to pick up its fuel by truck instead of by barge as it previously had done. Murphy charged L&L one-half cent per gallon more for the fuel obtained by truck than it charged for fuel obtained by barge. Many of L&L's competitors who continued to receive large quantities of fuel from Murphy were permitted to obtain the fuel by barge and paid one-half cent less per gallon than L&L. In addition to the increased cost of fuel, L&L incurred expenses because the cost of using trucks was higher than the cost of using barges. L&L had to raise the price of its fuel upon resale as a result of this action.

On April 11, 1979, Murphy terminated all sales to L&L. In order to fulfill its obligations to its own customers, L&L was forced to obtain fuel on the "spot market," and sometimes had to pay up to 70% more than the price charged by Murphy. L&L in turn had to charge its customers higher prices. Eventually, L&L was unable to compete in its service area. Because L&L supplied approximately 25% of the fuel in that area, its virtual elimination from the market significantly affected competition.

L&L alleged that Murphy violated § 2(e) of the Robinson-Patman Act which prohibits discrimination in "services or facilities" by requiring L&L to pick up its fuel by truck while competitors were permitted to take delivery by barge. The district court held that "delivery" was not a "service or facility" within the meaning of § 2(e) and thus L&L failed to state a claim for which relief could be granted.[1] L&L also alleged that Murphy's refusal to deal was in restraint of trade and therefore in violation of § 2(a) of the Act. The district court dismissed this claim as well, holding that a refusal to deal was not actionable under § 2(a).

L&L seeks reversal of both dismissals. Murphy argues in support of the dismissals and offers as an alternative ground for affirmance its contention that L&L's claims are jurisdictionally insufficient. We find the claims to be jurisdictionally sound; however, we affirm the dismissals of both of L&L's allegations for failure to state claims upon which relief could be granted.

*Jurisdiction*

Murphy challenges the jurisdictional sufficiency of L&L's claims under §§ 2(a) and (e) on the ground that the alleged discrimination did not occur "in commerce." Section 2(a)[2] specifically requires that both the

---

1. Originally, L&L also claimed that the one-half cent price differential was discriminatory but it agreed to a dismissal of that claim.

2. The jurisdictional statement in § 2(a) reads as follows:

That it shall be unlawful for any person engaged in commerce, in the course of such commerce .. to discriminate in price ... where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for

plaintiff buyer and defendant seller be "engaged in commerce" and that the discrimination occur "in the course of such commerce." Although § 2(e) does not explicitly state similar requirements, the jurisdictional bases of § 2(a) have been incorporated into § 2(e). *Cf. Shreveport Macaroni Manufacturing Co. v. F.T.C.*, 321 F.2d 404 (5th Cir. 1963); 5 vonKalinowski, *Antitrust Laws and Trade Regulation* § 34.03[2] (1981).

Murphy contends that the "in commerce" requirement was not met in this case because all of its sales were intrastate. Although Murphy purchased crude oil from outside of Louisiana, its reprocessing of the oil broke the chain of interstate commerce. Once reprocessed, Murphy oil was sold only in Louisiana. Thus, argues Murphy, there were no sales in interstate commerce.

■■■ L&L does not deny that Murphy's reprocessing interrupted the chain of interstate commerce. Instead, it argues that the commerce requirement was satisfied because its resales of No. 2 diesel fuel were to out-of-state customers and thus within the "flow of commerce." [3] We agree and hold that the jurisdictional requirement was met.

The Supreme Court has explained that the "in commerce" requirement covers "persons or activities within the flow of interstate commerce ... [defined as] the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974). We have identified three situations in which the "flow of commerce" is established:

(1) Where the goods are purchased by the wholesaler or retailer upon the order of a customer with the definite intention that the goods are to go at once to the customer;

(2) Where the goods are purchased to meet the needs of specified customers pursuant to some understanding with the customers, although not for immediate delivery; and

(3) Where goods are purchased based upon the anticipated needs of specific customers, rather than upon prior orders or contracts.

*Hampton v. Graff Vending Co.*, 516 F.2d 100, 102–03 (5th Cir. 1975).

L&L's purchases from Murphy clearly fell within the definition of "in the flow of commerce." L&L submitted affidavits proving that many of its customers were off-shore, that it had orders for over 50% of each barge load of oil it received from Murphy, and that the remainder was to serve the anticipated needs of retained customers. Thus, the "in commerce" requirement was satisfied.

### Section 2(e)

L&L alleged that Murphy discriminated against it in violation of § 2(e) of the Robinson-Patman Act by forcing it to take delivery by truck while other customers were permitted to use barges.[4] Section 2(e) prohibits any person from discriminating

> in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or

---

use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States.

**3.** Actually, L&L's sales were to off-shore drilling operations. Because the sea bottom is owned by the United States, *United States v. Louisiana*, 382 U.S. 288 (1965), the sales are considered to have been to "[an]other place under the jurisdiction of the United States", 15

U.S.C. § 13(a), and therefore within the court's jurisdiction.

**4.** The trucks used by L&L had the capacity to transport up to 8,000 gallons of fuel while the barges carried 100,000 to 350,000 gallons. As the amount of fuel sold to L&L was cut down, Murphy took the position that it could not accumulate and hold the lesser amounts until barge capacity was reached.

offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.[5]

15 U.S.C. § 13(e). In support of its position, L&L cites the Seventh Circuit's opinion in *Centex-Winston Corp. v. Edward Hines Lumber Co.*, 447 F.2d 585 (7th Cir. 1971), *cert. denied*, 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972), which held that "delivery" is a "service or facility" within the meaning of § 2(e). Murphy insists that the meaning of "services or facilities" is far narrower and only includes promotional and advertising services performed by the seller. Furthermore, even if delivery comes within § 2(e), Murphy contends that L&L's claim fails because the alleged discrimination was in connection with the original sale of the fuel and not the resale as required by § 2(e). Murphy relies upon those cases which have criticized and rejected *Centex-Winston*.

The definition of § 2(e)'s "services or facilities" presents an issue of first impression to this court.[6] The statute itself gives no indication as to the meaning of the terms. Courts have treated § 2(e) problems on a case by case basis tailoring their conclusions to the specific facts of the case before them rather than in conformity with a comprehensive definition of the terms. In promulgating regulations pursuant to § 2(e), the Federal Trade Commission noted the absence of statutory or judicial definition and issued a non-exclusive list of § 2(e) services or facilities. *See* 16 C.F.R. § 240.5 (1981).

Courts faced with the question of whether delivery constitutes a § 2(e) service or facility have disagreed on the issue. The Seventh Circuit is the only appellate court to have held explicitly that delivery is such a service. In *Centex-Winston, supra*, a lumber supplier consistently delivered lumber to one purchaser behind schedule while delivering to the purchaser's competitors on time. The court construed § 2(e) broadly and concluded that delivery was encompassed because § 2(e) prohibits any kind of "special favors," 447 F.2d at 587, that affect the resale of the product. Resale was affected by late deliveries because, arguably, the resale would be delayed. *Id.* at 588. *Accord Harper Plastics, Inc. v. Amoco Chemicals Corp.*, 617 F.2d 468 (7th Cir. 1980); *Glowacki v. Borden, Inc.*, 420 F.Supp. 348 (D.C.Ill.1976).

The Second Circuit implicitly recognized the validity of the *Centex-Winston* rationale, although district courts within the circuit have concluded otherwise. In *Harlem River Consumers Cooperative, Inc. v. American Grocers of Harlem, Inc.*, 371 F.Supp. 701 (S.D.N.Y.1974), the district court cited *Centex-Winston* with approval, *id.* at 710, but ultimately held that plaintiffs failed to prove their claim of delivery discrimination. The Second Circuit affirmed, 493 F.2d 1352 (2d Cir. 1974), but did not mention *Centex-*

---

**5.** Section 2(d) prohibits suppliers from paying for services or facilities furnished through or by the customer in connection with the processing, handling, sale, or offering for sale of any products or commodities. Sections 2(d) and (e), while worded differently, have been construed as prohibiting the same sort of activities on the part of suppliers. The developed caselaw refers to the provisions as counterparts and holdings under one section are considered to be authoritative for the other. Therefore, we may rely upon the cases decided under both sections in our discussion of § 2(e). *See* 5 *vonKalinowski, supra* at § 35.01 .06.

**6.** While the interpretation of the phrase is an issue of first impression, this is not our first encounter with § 2(e). In *Skinner v. United States Steel Corp.*, 233 F.2d 762 (5th Cir. 1956), we were faced with the question of whether special credit arrangements accorded some but not all of a manufacturer's purchasers constituted "services or facilities." We held that extensions of credit were not encompassed in § 2(e) because such services were not rendered in connection with the resale of the commodities purchased by the plaintiff from the manufacturer. 233 F.2d at 765. We did not attempt to formulate a definition of "services or facilities" except to state that credit arrangements were not included. In dicta, we said that the services or facilities must be "merchandising services." While this might indicate that § 2(e) is limited to advertising and promotional services, we read this language as bolstering the court's holding that the services or facilities must relate to the purchaser's resale of the product. The contrary interpretation suggested by Murphy requires an unnecessarily strained construction of the opinion.

*Winston.* Two years later, another district court within the Second Circuit ruled that delivery was not a § 2(e) service, *Diehl & Sons, Inc. v. International Harvester Co.,* 426 F.Supp. 110 (E.D.N.Y.1976); however, that court did not criticize or cite *Centex-Winston* or *Harlem River.*

*Centex-Winston* has met with much criticism and has been distinguished and rejected by other courts. In *Cecil Corley Motor Co. v. General Motors Corp.,* 380 F.Supp. 819 (N.D.Tenn.1974), the court expressly rejected the rationale of *Centex-Winston. Id.* at 851. After a careful review of the legislative history of § 2(e) and the authoritative commentaries, the court concluded that § 2(e) applies only to services or facilities relative to advertising, promotions, or merchandising and not to deliveries. *Id.*

In *Purdy Mobile Homes, Inc. v. Champion Home Builders Co.,* 594 F.2d 1313 (9th Cir. 1979), the Ninth Circuit joined the *Cecil Corley* Court in criticizing *Centex-Winston* as an unauthorized expansion of § 2(e), but chose to distinguish rather than reject *Centex-Winston.* The plaintiff, Purdy, alleged that the defendant's refusal to sell a particular line of mobile homes which was made available to Purdy's competitors constituted discrimination in delivery in violation of § 2(e). The court noted dissatisfaction with *Centex-Winston,* but held that even if the Seventh Circuit were correct in finding delivery to be a § 2(e) service, Purdy failed to prove a § 2(e) violation because all the defendant had done was refuse to sell to Purdy and thus there was no discrimination in delivery.

The Fourth Circuit adopted a similar approach. In *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52 (4th Cir. 1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975), plaintiff contended that the defendant supplier discriminated against it in delivery services because the supplier refused to sell it as many cars as requested. The court noted its concern over the validity of *Centex-Winston* but, like the Ninth Circuit, it distinguished the case before it by finding that the supplier's action constituted a discrimi-

nation in allocation, not in delivery, and thus was not actionable under § 2(e) regardless of the validity of *Centex-Winston.*

■ Finding ourselves unable to distinguish factually this case from *Centex-Winston,* we must take a position on the issue. We join the *Cecil Corley* Court in rejecting the *Centex-Winston* rule and its rationale. We hold that delivery is not a service or facility within § 2(e) and we affirm the district court's dismissal of this claim. Our conclusion is supported by the legislative history of § 2(e), the writings of prominent commentators, and several other court holdings.

Prior to the enactment of the Robinson-Patman amendments to the Clayton Act, § 2 applied only to direct price discriminations. Many suppliers were able to avoid the section's prohibitions by engaging in "secret" discriminations such as providing promotional services to their favored customers. These "secret" discriminations had the same anti-competitive effect as direct price discriminations, yet they were not prohibited by § 2. *F.T.C. v. Simplicity Pattern Co.,* 360 U.S. 55, 68, 79 S.Ct. 1005, 1013, 3 L.Ed.2d 1079 (1959); *see generally* 80 Cong. Rec. 9413-9422 (June 15, 1936). To remedy this situation, Congress enacted the Robinson-Patman amendments, including what is now § 2(e). The Report of the Conference Committee of the House of Representatives, 80 Cong.Rec. *supra* at 9413, makes it clear that § 2(e) was aimed at advertising and other promotional services. Services such as deliveries were never mentioned. *Id.* at 9418-19.

Commentators also support our conclusion that delivery is not a § 2(e) service. Congressman Wright Patman, one of the co-sponsors of the Act, stated that the intent of § 2(e) was to end disguised price discriminations in the form of advertising and promotional activities and cooperative merchandising. W. Patman, *Complete Guide to the Robinson-Patman Act,* 129-134 (1963). Frederick Rowe has also endorsed the view that § 2(e) only applies to advertising and promotional arrangements. F. Rowe, *Price Discrimination Under the Rob-*

inson-Patman Act 365–376 (1962). *Accord* vonKalinowski, *supra* at § 35.02 ("services and facilities" clearly refers to any form of advertising or merchandising function).

Except for *Centex-Winston* and the cases adopting its holding, the only arrangements courts have found to be services or facilities are those relating to promotional favors. *See, e.g., Simplicity Pattern Co., supra* (catalogs and display materials); *Nuarc Co. v. F. T. C.,* 316 F.2d 576 (7th Cir. 1963) (magazine advertising); *Hartley & Parker, Inc. v. Florida Beverage Corp.,* 307 F.2d 916 (5th Cir. 1962) (free merchandise for consumers); *Elizabeth Arden, Inc. v. F. T. C.,* 156 F.2d 132 (2d Cir. 1946), *cert. denied,* 331 U.S. 806, 67 S.Ct. 1189, 91 L.Ed. 1828 (1947) (demonstrator services). *See also* 5 vonKalinowski, *supra* at 35.02.[7] Thus aside from *Centex-Winston* and its progeny, there is no judicial support for L&L's suggested interpretation of § 2(e). The overwhelming view, which we accept, is that delivery is not a service or facility within the meaning of § 2(e) and thus the court was correct in dismissing L&L's § 2(e) claim.

■ Even if we accept L&L's contention that delivery is such a service or facility, we would still find the dismissal proper because there is another reason for rejecting L&L's position: § 2(e) requires that the service or facility relate to the resale of the product by the purchaser as opposed to the original sale from the supplier to the purchaser. *Skinner,* 233 F.2d at 765. *See also Purdy,* 594 F.2d at 1317; *Kirby v. P. R. Mallory & Co.,* 489 F.2d 904, 910–11 (7th Cir. 1973). The cases cited above concerning services or facilities held to be within § 2(e) show that in order to be sufficiently related to the purchaser's resale the supplier must become active in the resale of the product by, for example, providing display materials (*Simplicity*) or free advertising (*Nuarc*). Problems associated with the delivery of a product directly concern only the original sale.

Arguably, by allowing some purchasers special delivery privileges, the supplier may be aiding the resale by getting the product to the favored purchasers faster or more cheaply than to other purchasers. However, the supplier is not involved in any way in the actual resale of the product to the purchaser's customers and this is the type of activity necessary to bring the service or facility within § 2(e).

In *Skinner, supra,* a manufacturer arranged with some of its customers to permit the manufacturer's employees to shop in the customers' retail outlets and charge their purchases to the manufacturer who would deduct the expenses from the employees' paychecks. Although this arrangement certainly would induce the employees to shop at the favored stores, we held that the extension of credit was not sufficiently connected to the resale to constitute a service or facility under § 2(e). If an arrangement which encourages and enhances resale was beyond the scope of § 2(e), then the effects of a delayed delivery are equally remote. Thus, even if the definition of "service or facilities" were broad enough to encompass delivery, the action would still be barred because delivery is not sufficiently related to the resale of the product by the purchaser. The dismissal of L&L's § 2(e) claim is affirmed.

### Section 2(a)

L&L also contends that the court erred in dismissing its claim under § 2(a). That section provides, in pertinent part:

That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to

---

7. Actions found to be beyond the scope of § 2(e) include the offering of favorable credit terms to select customers, *Skinner, supra*; offering real estate transactions to induce sales, *Rea v. Ford Motor Co.,* 355 F.Supp. 842, 869 (W.D.Pa.1973), *vacated on other grounds,* 497 F.2d 577 (3d Cir. 1974), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); offering the privilege of purchasing in car lots at freight station rather than at public auction, *Ben B. Schwartz & Sons, Inc. v. Sunkist Growers, Inc.,* 203 F.Supp. 92 (E.D.Mich.1962).

create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them:

\* \* \* \* \* \*

And provided further, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade.

\* \* \* \* \* \*

15 U.S.C. § 13(a) (emphasis added).

L&L makes two arguments in support of this claim. First, it contends that Murphy discriminated in price between L&L and Murphy's other purchasers when Murphy terminated all sales to L&L and forced it to pay higher prices on the "spot market." The adverse effect on competition was the same as it would have been if Murphy itself had charged L&L the "spot market" price, argues L&L, and the fact that L&L paid the higher price to someone other than Murphy should be irrelevant.

■ This argument completely misses the point of § 2(a), however. It is well established that in order to allege a violation of § 2(a) one seller must have made at least two actual sales to two actual buyers at different prices. *Stough v. May and Company of Georgia, Inc.*, 484 F.2d 22, 23 (5th Cir. 1973); *Hiram Walker, Inc. v. A&S Tropical, Inc.*, 407 F.2d 4 (5th Cir. 1969). *Accord Walker Oil Co. v. Hudson Oil Company of Missouri, Inc.*, 414 F.2d 588 (5th Cir. 1969). *See generally* L. Sullivan, *Antitrust* § 218 (1977); 4 vonKalinowski, *supra* at § 24.02.

■ L&L did not allege that Murphy sold oil to different purchasers at different prices, nor did it allege that it bought oil from Murphy at higher prices than other purchasers. Instead L&L's claim was that Murphy absolutely refused to deal with it. Because the basic allegations of price discrimination were absent from L&L's pleadings, the court was correct in dismissing the § 2(a) claim. The fact that there was an adverse effect on competition does not convert Murphy's action into a violation of § 2(a) when the prerequisites of that subsection are missing.

■■ L&L also attempted to establish a violation of § 2(a) by alleging that Murphy's refusal to deal was in restraint of trade and therefore prohibited by the proviso to § 2(a). In so arguing, L&L read substantive prohibitions into the proviso which would make actionable a refusal to deal in restraint of trade without regard to the traditional § 2(a) requirement of price discrimination between two buyers. This is a strained, and in our view, erroneous interpretation of the proviso. It has never been adopted by any court or commentator.

Each court which has considered an alleged refusal to deal in the context of § 2(a) has held unequivocally that a refusal to deal, standing alone, is not actionable under § 2(a). *See Purdy*, 594 F.2d at 1318; *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 294 & n.10 (7th Cir. 1974); *Naifeh v. Ronson Art Metal Works, Inc.*, 218 F.2d 202 (10th Cir. 1954); *Cecil Corley*, 380 F.Supp. at 850; *Harlem River*, 371 F.2d at 709. L&L argues that the present case is distinguishable because here the refusal to deal was in restraint of trade—a fact which was absent in the cited cases. Even if we assume that Murphy's actions were in restraint of trade [8] our conclusion that the claim cannot be brought under § 2(a) would remain unchanged.

---

**8.** "In restraint of trade" has a specific meaning in the context of antitrust laws. An anti-competitive result such as the elimination of wholesalers from the market-place is not necessarily "in restraint of trade" even though in the literal sense trade is restrained. For an action to be "in restraint of trade" it must be accomplished with a prohibited motive or in violation of antitrust laws. *See* 80 Cong.Rec. *supra* at 9418;

*Harlem River*, 371 F.Supp. at 709 (restraint of trade includes actions accompanied by an unlawful agreement within the meaning of § 1 of the Sherman Act, and actions conceived with a monopolistic purpose within the meaning of § 2 of the Sherman Act); *Sunkist Growers Inc. v. Winckler & Smith Citrus Products Co.*, 284 F.2d 1, 16 (9th Cir. 1960) (a refusal to deal is in restraint of trade if it is in violation of a statute

The Robinson-Patman Act prohibits direct and indirect price discriminations and nothing more. The proviso to § 2(a) merely reiterates the principle announced in *United States v. Colgate*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), that a supplier may choose its own customers so long as it does not do so in restraint of trade. *See* 80 Cong.Rec. *supra* at 9418; 4 vonKalinowski, *supra* at § 22.-01[1]. The proviso creates no substantive rights. Congress' purpose in including it in § 2(a) was to underscore the vitality of the Colgate doctrine which was already incorporated into the Clayton Act. *Simplicity Pattern Co.*, 360 U.S. at 64, 79 S.Ct. at 1011. *See also* 80 Cong.Rec., *supra* at 9418; W. Patman, *supra* at 85. The proviso ensures that a supplier who merely refuses to sell a product to a customer will not be held in violation of § 2(a). If the refusal is in restraint of trade, however, the proviso will not protect a supplier from liability under other antitrust laws. Read together, the body of § 2(a) and the proviso state that a supplier may refuse to deal absolutely with any customer, but once it decides to deal, it must do so evenly among all its customers as to price. Standing alone, the proviso does not create a cause of action.

A refusal to deal in restraint of trade may be actionable under other antitrust laws even though it is beyond the scope of the Robinson-Patman Act. *Lee-Moore Oil Co. v. Union Oil Co.*, 599 F.2d 1299 (4th Cir. 1979), upon which L&L relies heavily, is such an example. There, an oil supplier terminated its relationship with a customer during an energy shortage forcing the customer to buy noncompetitive products on the spot market. The customer brought suit under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, alleging that the supplier's refusal to deal was part of a conspiracy to drive it out of the market. The court held this allegation actionable under the Sherman Act.[9]

If Murphy's refusal to deal was in restraint of trade, L&L's cause of action might be cognizable under other federal antitrust laws. But L&L does not have a cause of action under the Robinson-Patman Act. As the court stated in *Cecil Corley*, *supra*, the Robinson-Patman Act "is not all-encompassing, and does not provide relief against every form of unfair or inequitable treatment of customers. It does not, for example, reach what arguably is the most extreme discrimination of all: namely, a total refusal to even deal with a particular individual or class of customers." 380 F.Supp. at 850. The court below was correct in dismissing L&L's § 2(a) claim.

In summary, L&L's claim that Murphy discriminated against it by compelling L&L to take delivery by truck is not cognizable under § 2(e) of the Robinson-Patman because "delivery" is not a "service or facility" within the meaning of the Act. In the alternative, the method of delivering a product to a customer is not sufficiently connected to the customer's resale of the product to bring delivery within the coverage of § 2(e). L&L's claims under § 2(a) of the Act fail because the basic prerequisite that there be two sales to two buyers is lacking and because the proviso concerning refusals to deal in restraint of trade does not create a cause of action. The district court properly dismissed both claims.

AFFIRMED.

specifically prohibiting refusals or if it is otherwise in violation of the Sherman or Clayton Acts or § 5 of the Federal Trade Commission Act).

9. L&L quotes the part of the *Lee-Moore* opinion in which the court likened the refusal to deal to a price discrimination. L&L asks us to accept this analogy and permit it to bring its refusal to deal claim under the price discrimination statute. We cannot do that, however.

First, the Lee-Moore court mentioned the similarities between refusals to deal and price discriminations in dicta only to emphasize the dramatic, adverse effect on competition a refusal to deal might have. Second, while the effects of a refusal may simulate those of price discrimination, the two activities are not synonymous and only one of them—price discrimination—is actionable under § 2(a).