**DINO DeLAURENTIIS CINEMATO-GRAFICA, S.p.A., Plaintiff,**

v.

**D-150, INC., Defendant.**

**No. 65 Civ. 3217.**

United States District Court
S. D. New York.

July 25, 1966.

Anthony G. Di Falco, New York City, for plaintiff, Sidney A. Florea, New York City, of counsel.

Wachtell, Lipton, Rosen, Katz & Kern, New York City, for defendant, Herbert Wachtell, Theodore Gewertz, Bernard W. Nussbaum, and Elizabeth Holtzman, New York City, of counsel.

## OPINION

TYLER, District Judge.

Defendant seeks an injunction *pendente lite* to prevent plaintiff (hereinafter sometimes referred to as "DDLC") and its agents and all persons acting "in active concert" with them from exhibiting or causing the exhibition of the film, "The Bible", in "hard ticket reserved seat releases" in the United States, Canada and Europe, unless such exhibition is in the D-150 process wherever economically and physically practicable.

It is said or implied in support of the motion that, absent temporary injunctive relief, DDLC will "cause" release of "The Bible" on or about September 28, 1966 in

30 major cities in this country and Canada and 24 principal cities in Europe without usage of the wide-screen process known as D–150 and thus in flagrant breach of DDLC's contractual commitments to defendant. The D–150 process which is central to this dispute can be described fairly as a new screen "dimension" or process, assertedly developed and owned by defendant, which permits projection of a movie film upon a large "wall-to-wall" screen with a curvature of about 150 degrees.

The history and present posture of this litigation is sufficiently unusual to warrant a brief summary. DDLC commenced this action in the Supreme Court of New York, New York County, in November, 1964, seeking a declaratory judgment of the existence of a contract between the parties and an injunction against an alleged threatened breach of this contract by the defendant. Four months later, in March, 1965, and apparently upon information that DDLC had then shifted or was about to shift its original position in this suit and abjure the existence of a binding contract, defendant brought on a motion for a temorary injunction substantially similar to the one at bar. At the same time, defendant sought leave to file a supplemental answer asserting various counterclaims, including one for permanent injunctive relief. On May 6, 1965, Madame Justice Amsterdam filed a memorandum denying defendant's application for injunctive relief *pendente lite* but granting leave to defendant to file an amended answer as prayed.

In the fall of 1965, ostensibly as a result of an application by defendant, Mr. Justice McCaffrey of the Supreme Court of New York granted a preference for trial. Nevertheless, two days after this preference was granted, defendant caused this action to be removed to this court upon allegations of diversity of citizenship. In fairness to defendant, it appears that this was the first opportunity for defendant to remove because it was on October 27, 1965 that plaintiff stipulated to discontinue this action against the co-defendant, Todd–AO Corp., which is a New York corporation, thereby creating complete diversity between the remaining parties.

There then ensued protracted depositions, various practice motions and similar activity in this court until March, 1965 when a formal pre-trial order was entered and the case placed on the ready non-jury calendar. Since the pre-trial order was entered, defendant has made several applications for an immediate trial of this action. Necessarily, however, these various applications were denied by the Chief Judge of this court because of the prevailing shortage of judicial manpower in this district.

On June 28, 1966, Judge MacMahon of this court granted defendant's General Rule 9(*l*) application for leave to make its present motion.

As this history suggests, the parties and their respective positions have substantially "turned about" since suit was filed by DDLC some twenty months ago; defendant now invokes most heavily the contract it originally was claimed to have breached, whereas plaintiff defends by repudiating the existence of such a contract.

At the hearing of this motion, no testimony was taken. Many exhibits marked during the pre-trial depositions were handed up to the court, however, and, in addition, the voluminous deposition transcripts were also submitted for consideration upon this motion. Both parties agreed that no further oral testimony was necessary, and upon my evaluation of the rather bulky record before me, I agree that all the necessary facts are before the court for resolution of this application.

It is the defendant's essential position here that the parties entered into a binding contract on May 8, 1964 and that this contract imposed upon DDLC the obligation to cause the exhibition of the film, "The Bible", with the D–150 process in

road show exhibitions in key cities in the United States, Canada and Europe.[1]

Conversely, it is DDLC's position that there was no binding contract at all between the parties, but if there were such an agreement, it imposed no such obligation upon the plaintiff. Further, DDLC urges that it does not own the film nor does it have any control over the exhibition of "The Bible"; that the defendant has not and cannot show irreparable harm under the circumstances here, especially since it has an adequate remedy in damages; and that defendant has slept on its rights for at least a year and a half.

For the purposes of resolution of this motion, it will suffice to set forth hereinafter a brief chronology of the contract negotiations between the parties in 1964 and other significant events which took place in that year, largely as seen from the viewpoint of the moving defendant. In January, 1964, preliminary negotiations between the parties for a licensing arrangement involving the D–150 process for "The Bible" commenced between Mr. Ralph Serpe, the American representative of DDLC, and Messrs. Marshall Naify and Salah M. Hassanein, representatives of the defendant. Naify was and is president of defendant corporation and of its parent firm, United Artists Theatre Circuit, Inc. Hassanein was and is executive vice president of the latter corporation. These negotiations were resumed in March, 1964 in Los Angeles and were from time to time attended by the three men mentioned above and other representatives of the parties. Concurrently, separate negotiations were being conducted between DDLC and an affiliate of defendant known as Magna Pictures Corp.

for an agreement for financing and distribution of the film "The Bible".

During the early months of 1964, it was apparently contemplated by DDLC that filming of "The Bible" on location in Italy would begin on or about May 11, 1964. In the first days of May, however, an impasse was reached respecting the negotiations between Magna and DDLC for a financing and distribution agreement. Despite the breakdown of the Magna-DDLC discussions, the parties in this suit continued to be desirous of reaching a firm agreement whereby DDLC would be licensed by defendant to use the latter's D–150 techniques, material and equipment for immediate filming of "The Bible". Accordingly, in early May, DDLC's president, Mr. Dino De-Laurentiis, assigned a Mr. Borgognoni, DDLC's Italian counsel, the task of negotiating with defendant a license arrangement. Borgognoni thereupon May 7 cabled Harold Berkowitz, DDLC's lawyer in the United States, certain instructions incident to obtaining a firm contract for use by DDLC of the D–150 equipment, independent of any financing or distribution deal.

As a result of the May 7 cable, Berkowitz and Serpe on behalf of DDLC and Naify on behalf of the defendant reopened negotiations for a license arrangement. On the following day, May 8, Serpe and Naify on behalf of their respective principals prepared, signed and transmitted to Borgognoni a cablegram. According to defendant, this cablegram constitutes a binding contract between the parties—and, more important for present purposes, the principal fulcrum in support of the rather drastic relief here sought.[2]

---

1. As I understand defendant further, it would refine this position to concede that DDLC's obligation is to use the D–150 process in only those theaters equipped to handle the same.

2. The cablegram in full reads as follows: "Marshall Naify cabled Rogers yesterday instructing him to continue working and give Dino maximum cooperation stop with complete knowledge and collaboration

Kerkowitz have obtained Naify acceptance your May 7th cable suggestions stop Naify drafting D–150 licensing contract independent from Bible financing distribution deal which will include following basic conditions stop for rental and use of D–150 equipment as per package list sent Dino terms are dollars 100,000 payable dollars 25,000 on execution license agreement dollars 25,000 on delivery all specified D–150 equipment dollars 25,000 on

It will be assumed *arguendo* that defendant ultimately can sustain its position that the May 8 cable constituted a binding contract between the parties. By its terms, it provided for a "licensing contract independent from Bible financing distribution deal". According to its recitals, the basic terms were for "rental and use of D–150 equipment" upon payment by DDLC to defendant of a total consideration of $100,000 plus royalties which, ignoring certain refinements not pertinent here, can be described at a rate of "five cents a seat". The first $25,000 of the lump sum consideration was to be paid upon execution by the parties of a formal license agreement; an additional $25,000 was to be paid on delivery of all specified D–150 equipment. The third increment of $25,000 was to be paid upon the first public 70mm road show release, and the last increment of $25,000 was to be paid on the first public 35mm release. In addition, a royalty of five cents per seat sold on United States and Canada D–150 and 70mm hard ticket reserve seat releases was stipulated; similarly, a 3½% of gross royalty (after deducting box office taxes) was provided for certain European showings which again were limited to D–150 and 70mm road show hard ticket reserve seat releases. Finally, it may be significant to note that the cable further stipulated that if the financing and distribution agreement for "The Bible" were concluded between Magna and DDLC, the licensing agreement between DDLC and defendant would be amended to add a royalty of five cents per seat sold on all 70mm releases in the United States and Canada and a percentage royalty for European box office receipts "on all 70mm foreign releases".

Though contemplated by the cable and other negotiations between the parties, a formal licensing agreement in fact was never executed. In July, 1964, DDLC advanced the claim that the terms of the May 8 cable were contingent upon Magna proceeding with the financing and distribution of the picture. Despite continuing bickering and backing and filling on the part of representatives of both parties, it nevertheless appears that throughout the year 1964 equipment of the defendant for use in the D–150 process continued to be used on the film location in Italy and perhaps elsewhere. That this was the case is perhaps best illustrated by the apparent circumstance that this suit was commenced by plaintiff for the purpose, among others, of preventing defendant from removing its personnel and equipment from the set before shooting was completed. Finally, as already indicated, in the spring of 1965, after suit had been pending for some months, plaintiff abjured the existence of any binding license agreement with the defendant.

Of significance to this controversy is the fact that plaintiff DDLC is the producer but not the owner of the film in question. On April 2, 1964, more than a month before the May 8 cablegram, DDLC executed a contract with Thalia AG granting to the latter corporation all rights of distribution and subdivision and of making exhibition licensing arrangements, with certain exceptions not here relevant. From the documentary evidence before me, I must assume that defendant was either aware or should have been aware of this agreement of April 2, 1964 at or shortly after the time of its execution. Moreover, on June 22, 1965, Thalia entered into a licensing and distribution agreement with Twenti-

first public 70mm road show release and dollars 25,000 on first public 35mm release stop plus five cents per seat sold on US Canda D–150 and 70mm hard ticket reserved seat releases amounting to approximately thirty situations and 3–1/2–0/0 of gross after deducting box-office taxes in key European situations limited to D–150 and 70mm roadshow hard ticket reserved seat releases stop if Bible

financing and distribution agreement concluded licensing contract to be modified to add that five cents per seat sold will be charged on all repat all 70mm releases in US and Canada and 3–1/2–0/0 of gross after deducting box office taxes on all 70mm foreign releases stop draft of contract will be sent you next week with copy to Berkowitz Regards Marshall Naify Ralth Serpe."

eth Century-Fox Film Corporation ("Fox"), under the terms of which Fox acquired world-wide distribution rights to "The Bible".[3] It was stated by the parties on argument that Fox apparently plans distribution and releases of "The Bible" upon ordinary 70mm film—i. e. not upon D–150 processed film.

For reasons to be briefly developed hereinafter, it is concluded that the motion for a temporary injunction must be denied. In this connection, I assume without deciding that the earlier denial by a justice of the Supreme Court of New York of an application for similar relief is neither *res judicata* nor collateral estoppel of the present motion. Nonetheless, it cannot be gainsaid but that this earlier decision and the chronology of this litigation as a whole place an even heavier burden than usual upon the movant.

The principal reason for denying the drastic relief here prayed is that the defendant has fallen far short of the mark in its efforts to establish irreparable harm. In so concluding, I accept *arguendo* defendant's thesis that the May 8 cablegram constituted a binding contract between the parties. But the next postulate of plaintiff—i. e. that the May 8 cable was "instinct with an obligation" on DDLC's part to exhibit the film in the D–150 process, see, e. g. Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, at page 91, 118 N.E. 214 (1917)—presents a close question which, as I view the exhibits and depositions, can only be resolved after a plenary trial. More to the point presented by this motion, I cannot say that defendant has established likelihood of success on this crucial issue. Put differently, it is possible that a court could determine after a plenary trial of this suit that the thrust of the understanding between the parties was that DDLC would use D–150 equipment and know-how for purposes of filming "The Bible" in exchange for a lump-sum royalty payment plus certain stipulated percentage royalties upon release of the picture in either "standard" 70mm film or in the D–150 process. In still plainer language, it seems to me that the May 8 cablegram and all of the surrounding negotiations might be construed as a commitment by DDLC to use D–150 equipment in exchange for payment of royalties but reserve unto itself the determination of whether or not "The Bible" ultimately would be released in the D–150 process.

If it be assumed that such an interpretation is unwarranted and that defendant will prove that the thrust of the contract was a commitment by DDLC to release in the D–150 process, defendant is in not much better a position for the purposes of temporary injunctive relief. This is so, in my opinion, because the May 8 cablegram stipulations regarding royalties can be fairly understood to set forth in substance the measure of damages to which defendant would be entitled if it prevails in this litigation. It is difficult to conceive how defendant can be "irreparably harmed" where the very contract on which it relies, if construed as it urges, spells out compensation which its agents thought appropriate and bargained for in the spring of 1964. It is true, of course, that defendant valiantly strains to avoid this obvious hurdle by statements in the Hassanein affidavit that damages based upon the stipulated royalties will not adequately compensate it for loss of prestige in the industry if what promises to be a widely distributed and heralded film is not released in the D–150 process. Specifically, it is asserted in this connection that the D–150 process is novel and will only be successfully launched and promoted if it is used in connection with a major picture such as "The Bible" promises to be. In the next breath, however, defendant asserts that the royalties based upon admissions to the hard seat exhibitions will necessarily be less on the basis of a 70mm release as opposed to a D–150 release. If the D–150 dimension is as novel as defendant claims it to be, I am constrained to find these contentions somewhat incon-

---

**3.** With certain minor exceptions not here relevant.

sistent and, in any event, largely speculative.[4]

■■ What has just been discussed suggests another reason for denying defendant's application. DDLC's counsel urges, and I agree in substantial part, that defendant seeks in effect to attain more than preservation of the *status quo pendente lite*. In short, defendant seeks a mandatory injunction which would "alter rather than preserve the *status quo* and yield to (defendant) the full measure of relief * * *" theoretically achievable only in the event that it prevails on all the controverted issues in the case. Poe v. Michael Todd Company, 151 F. Supp. 801, at page 803, S.D.N.Y.1957. Every lawyer is aware of the hoary maxim that mandatory injunctive relief, particularly where it changes the *status quo*, is the rarest form of relief available prior to final adjudication (see, e. g., Zugsmith v. Davis, 108 F.Supp. 913, S.D.N.Y. 1953), and from what has already been discussed, issuance of such a drastic order as here sought almost certainly would be an abuse of discretion.

■ But still another formidable obstacle to defendant's application is presented by the apparent circumstance that if this or any court were constrained to issue an order exactly as prayed, it is at least doubtful that such an order would achieve the desired relief. As discussed hereinabove, DDLC does not own the film "The Bible". Defendant knew or should have known in May, 1964 that one month before DDLC had conveyed all of its rights to distribution and exhibition of this film, among other rights and title, to Thalia. Thalia, as indicated, thereafter contracted with Fox to distribute this film on a world-wide basis. As provided by Rule 65(d), F.R.Civ.P., any injunction order can only be binding upon the parties or their officers or agents or employees or upon "those persons in active concert or participation with them * *". In view of the undisputed contractual arrangements just discussed, I must as-

sume that defendant in its specific recitals of the relief sought intends this court either to (1) "cause" DDLC to instruct Thalia and its assigns to release "The Bible" in the D–150 process or (2) order DDLC, Thalia and its contractual privies to so release the film. Nothing in the papers before me, however, tends to establish that Thalia or Fox or any of their sublicensees have been in active concert or combination with DDLC in connection with the matters at issue in this suit. Defendant does not seriously suggest, let alone produce evidence of, any conspiracy by Thalia, Fox and others to interfere with the alleged contractual relationship between DDLC and defendant. Particularly in view of the undeniable fact that Thalia had acquired title to the film and its production rights before May 8, 1964, defendant no doubt wisely realizes that any such claims would be at once suspect.

To be sure, some of the cases suggest that persons "in privity" with an enjoined party can also be restrained. E. g. Regal Knitwear Co. v. N. L. R. B., 324 U.S. 9, at page 14, 65 S.Ct. 478, 89 L.Ed. 661 (1945). But the chain of privity of contract to be found here between DDLC and Thalia, Thalia and Fox, and, perhaps, Fox and its sublicensees does not present the necessary elements of representation and identity of interests which, as I understand the authorities and the language of Rule 65(d), must be found in order to bind persons not parties before the court. See Alemite Mfg. Corp. v. Staff, 42 F.2d 832, 2 Cir. 1930; Moore's Federal Practice, Vol. 7, Sec. 65.13 and cases therein cited. For these reasons, I fail to see how this court can properly issue an order directly embracing and restraining Thalia, Fox and their privies. If these entities cannot be reached directly by an injunctive order, it is equally difficult to understand how an indirect order —i. e. an order to DDLC to in turn "cause" certain action or non-action by parties not before the court—would be proper or efficacious.

---

**4.** The same view, alas, must be taken of defendant's suggestions that DDLC is or may be in financial difficulties.

In sum, even viewing the facts in a light most favorable to the moving defendant, it can be seen that the requisite balancing of hardships does not tip in favor of the relief here sought. See Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 2 Cir. 1953; Universal Major Electric Appliances, Inc. v. Universal Major Corporation, 138 F.Supp. 745, S.D.N.Y.1956. This is particularly so where, as here, if its contractual theory ultimately prevails, defendant can recoup by way of money damages pretty much what it bargained for in May, 1964.

The motion is denied. It is so ordered.