**HARLEM RIVER CONSUMERS COOPERATIVE, INC., Plaintiff,**

v.

**ASSOCIATED GROCERS OF HARLEM, INC., et al., Defendants.**

**No. 70 Civ. 4128.**

United States District Court,
S. D. New York.

Feb. 7, 1974.

---

See also, 2 Cir., 450 F.2d 271.

Cora T. Walker, New York City, for plaintiff.

Joseph Zuckerman, Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, for defendant Retail, Wholesale & Chain Store Food Employees Union, Local 338, and Liaison Counsel for defendants.

Stanley Bierman, Unterberg, Bandler & Goldstein, New York City, for defendant Associated Food Stores, Inc.

Roberto Lebron, New York City, for defendant Fedco Foods, Inc.

Bernard J. Ferguson, Woodside, N. Y., for defendant Mid-Eastern Cooperatives.

Sanford B. Goldberg, Farber, Raucher & Goldberg, New York City, for Pioneer Food Stores, Inc.

Howard Weinreich, Guggenheimer & Untermeyer, New York City, for defendant Shopwell, Inc.

Robert Sugarman, Berger, Kramer & Levenson, New York City, for Sloan's Supermarkets, Inc.

Sol Needle, Sirota & Kurta, New York City, for Theodore Solomon, Aaron Kaufman, and Harry Rosenblum.

### MEMORANDUM OPINION AND ORDER

PIERCE, District Judge.

The history of the struggle for survival waged by Harlem Consumers Cooperative, Inc. (the Co-op) is not unknown, and has not gone unheeded in this court. A few years after its founding in 1967 as a consumer-owned, community-based, cooperative supermarket, it sought and

won a preliminary injunction in its antitrust action against forces hostile to it within Harlem grocery trade circles. Thereafter, some of the principals in the civil action were convicted of criminal charges relating, in part, to the episode which precipitated the injunction. At least two of those defendants are presently in bankruptcy proceedings, also in this court.

Now, with the antitrust action well into preparation for jury trial on the merits, the Co-op seeks once again a temporary surcease to problems which threaten to overwhelm it. But, this chapter of the Co-op's story serves to demonstrate that there are limits to the kinds of problems capable of resolution by a court of law or equity, however worthy the Co-op's unique goals may be.

The Co-op's present motion, made under the umbrella of the antitrust action, is one for further preliminary injunctive relief. In the main, it charges that certain defendants and a non-defendant have combined to deny the Co-op access to national brand food products which are essential to the conduct of its business. After seventeen court-days of testimony and the receipt of hundreds of exhibits into evidence, the plaintiff Co-op rested its direct case on December 27, 1973, and this Court took under advisement defendants' application to dismiss the plaintiff's motion for failure of proof.

During the hearing, every reasonable opportunity to support its allegations was extended to the plaintiff. The plaintiff subpoenaed and ranged freely through the non-defendant's records. Evidence and testimony, immaterial on the surface, was admitted subject to connection. And well into the hearing, at the Court's urging, defendants agreed to limit and defer full cross-examination of plaintiff's witnesses to expedite the presentation of the Co-op's direct case.

Despite the length of the hearing and the mass of evidence, plaintiff has shown neither that it has been discriminated against, nor that a group of defendants have combined to put it out of business. Instead, if the evidence permits any conclusion at all, this hearing has shown that generally unstable economic conditions and even unpredictable weather conditions share the responsibility for a shortage of food which is endemic in the industry and which is the cause of plaintiff's plight. It is a plight suffered by plaintiff's competitors as well. Shortages, of one kind or another are, all too often, a fact of life in the United States in these times. Although there is little doubt that they impact harder on independent, single-unit businesses such as plaintiff's, this Court has not been given the power, by the Constitution or the Congress, to control such elements. The sometimes hostile forces of nature and of the economy, standing alone, are simply not amenable to antitrust laws.

Thus, for plaintiff to have shown that it was experiencing food shortages was not enough in this hearing. Plaintiff's burden was to show that it was getting less than its fair share of the supplies that *were* available because of a conspiracy among the named defendants and others to injure the Co-op's business. This Court finds that plaintiff has not met that burden, and grants the defendants' application to dismiss the plaintiff's motion at the end of plaintiff's direct case. Plaintiff's motion for further injunctive relief is therefore denied, for reasons discussed in detail below.

### Background

The Co-op opened its doors in June of 1968. Its stated purpose was to provide the residents of Harlem, one of New York City's major black communities, with quality food at low cost. Toward that end, according to the Co-op's president, approximately 4,300 consumer shareholders have invested about $327,000 in the venture. The Co-op is about the size of an average high volume supermarket, the indices being its 10,000 square feet of space; its normal stock of about 8,000 food and household

items; and its original projected gross weekly income of $38,000.

The controversy which first brought the Co-op to this court was manifested in a strike of its retail clerks called by the Retail Wholesale & Chain Store Food Employees Union, Local 338 (Local 338) which began in April of 1969 and effectively reduced the Co-op's ability to obtain supplies from food manufacturers and distributors. Its weekly gross dropped to $18,000; the number of items on its shelves dropped to about 2,000. After enduring a violent picket line for more than a year, the Co-op commenced this action, charging violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2; and Sections 2, 3 and 4 of the Clayton Act, 15 U.S.C. §§ 13, 14, 15.

The complaint named more than forty defendants, among them—designated as "core" defendants—were Local 338; Coordinated Community Services, Inc. (CCS), a food promotion company operating in Harlem; the Associated Grocers of Harlem (AGH), a trade association; and a number of individuals who were principals of one or more of these organizations. In addition, the complaint named some twenty-seven "manufacturers and suppliers" of food products and equipment, and some eight "competitors" doing business in the Harlem target area, as defined by the plaintiff.

In October of 1970, plaintiff moved against the "core" defendants and the "manufacturer/suppliers" for prelimi-

nary injunctive relief. After a brief hearing, Judge Mansfield, then of this court, characterized the evidence as revealing

> the dismal picture of labor union officials using their union's power to call a strike for the purpose of trying to coerce an employer into dealing with a private business concern owned in part by them and from which they individually derive substantial profit.[1]

The strong showing made by plaintiff at that hearing was buttressed by the high visibility of the violent strike, direct evidence of coercive pressure exerted on the plaintiff by some of the "core" defendants, and testimony adduced at a prior NLRB hearing which had laid bare the relationship between the alleged "core" conspirators. The injunction was granted against the "core" defendants who were directed to cease interfering with plaintiff's business through the strike or by any other means.[2] The motion was held in abeyance as against the "manufacturer/suppliers" upon their assurance that with the strike enjoined, they would service plaintiff.[3] The "competitor" defendants were not moved against or involved in those proceedings for the strike injunction.[4]

The Co-op's business, freed from restraint, soared. By August of 1972, it had reached a weekly gross of around $47,000, considerably above its early projections. Meantime, the injunction was upheld by the Court of Appeals in the fall of 1971,[5] and, following a few false starts caused by the district court's change to the Individual Assignment

1. Unreported opinion, #70 Civ. 4128, S.D. N.Y., Nov. 12, 1970.

2. Order of Nov. 25, 1970, #70 Civ. 4128, S. D.N.Y. In addition to enjoining the strike, the decree contained the following language, restraining the "core" defendants and all persons in active concert or participation with them . . .
   (D) from engaging in conduct, directly or indirectly, which would prevent plaintiff from carrying on its business, including the purchase by and delivery to plaintiff of food products and equipment, the sale of its food products, the hiring of person-

nel and the servicing of equipment; (E) from threatening or otherwise interfering with, directly or indirectly, manufacturers, vendors, suppliers, service concerns and customers of plaintiff, and any one else who does or seeks to do business with plaintiff . . . . . .

3. Court proceedings, #70 Civ. 4128, S.D.N. Y., Nov. 17, 1970, Trans. at 31-32.

4. Plaintiff's Affidavit in Support of Motion for Preliminary Injunction, Oct. 7, 1970, ¶ 3(ii).

5. 450 F.2d 271 (2d Cir. 1971).

System and plaintiff's subsequent successful motion for the assigned judge to recuse himself,[6] the pre-trial preparation of this action began in earnest under the supervision of a magistrate and this Court in the late winter of 1973.

These pre-trial proceedings have been marked by periodic interruptions and eruptions of issues and personalities which have diverted counsel from the hard task at hand, that of preparing this unwieldy case for jury trial.[7]

By far the most consuming of these diversions has been plaintiff's charges, thus far unsupported, that all of the defendants are continuing to plot against it in spite of the earlier injunction.

This assertion was first vaguely made in a form letter dated May 25, 1973, from plaintiff's then trial counsel, addressed to all forty-one defendants.[8] This letter provoked what can only be characterized as a paper storm by return mail, and on June 4, 1973, at a general pre-trial conference, plaintiff's trial counsel withdrew the letter. There the matter rested for a number of months, although after trial counsel was discharged in August of 1973, plaintiff's Coordinator-Legal Counsel, who took over active litigation of the case,[9] ver-

bally expressed the need for relief on several occasions.

### The Motion for Further Relief

Finally on October 26, 1973, plaintiff moved formally against all defendants for further injunctive relief, charging, among other things, that the earlier injunction was being circumvented by the use of a non-defendant food wholesaler, Met Food Corp. (Met), plaintiff's major supplier of national brand dry grocery products.

The underlying grievance was that Met deliveries to the Co-op had been incomplete and, on occasion, late. As a result, plaintiff alleged, its shelves were nearly bare and its weekly gross had dropped to $35,000. At a mass meeting of defendants on October 30, 1973, plaintiff named only nine of the defendants as the conspirators with Met, and released the other defendants. Plaintiff later narrowed the pertinent time period to August 28, 1973 through October 24, 1973. The theory which brought the nine defendants into the picture was that certain of the previously enjoined defendants (Local 338, and Harry Rosenblum, Aaron Kaufman and Theodore Solomon, all past or present officers of AGH)[10] had combined with "competi-

6. Unreported opinion, #70 Civ. 4128, S.D. N.Y., Dec. 26, 1972 (Carter, J.)

7. Some progress has been made. See, e. g., Unreported Memorandum and appended Order with Respect to Lead and Liaison Counsel, and Memorandum of Understanding with Respect to Lead Counsel, #70 Civ. 4128, S.D.N.Y., Oct. 24, 1973.

8. The letter stated, among other things, that
. . .
[Since the injunction] certain [unnamed] defendants and a number of non-defendant suppliers have apparently engaged in a course of conduct which can only be interpreted as deliberate interference with plaintiff's business. We have been advised that these actions have been taken because of "pressures" in the industry not to service Harlem Co-op. This course of conduct has increased dramatically in the last month during the course of Court ordered depositions. . . . . . .
We are constrained to advise you that our client will not sit idly by and tolerate in-

terruptions and interferences with its business.

9. After trial counsel was discharged, defendant Local 338 moved to disqualify plaintiff's Coordinator-Legal Counsel from actively representing the Co-op in this litigation, asserting that Ms. Walker, as the "guiding spirit" of the Co-op would or should be a key plaintiff's witness at trial. This Court denied the motion, giving plaintiff, instead, the option of continuing with Ms. Walker as its sole counsel, with restrictions on her trial testimony; or retaining new trial counsel, in which event her testimony would be subject only to the restrictions imposed on any other witness before the jury. Unreported opinion, #70 Civ. 4128, S.D.N.Y., Oct. 29, 1973.

10. Rosenblum and Solomon were convicted along with three other "core" defendants for violations of 29 U.S.C. § 186 growing out of the dispute, among other things, with the plaintiff. Although their own convictions were not appealed, the Second Circuit af-

tor" defendants (Associated Food Stores, Inc. [Associated], Fedco Food Stores, Inc. [Fedco], Mid-Eastern Co-operative [Mid-East], Shopwell, Inc. [Shopwell], and Sloan's Supermarkets, Inc. [Sloan's]), and that these two groups had forged non-defendant Met into a new tool to put plaintiff out of business. The means alleged was discriminatory patterns of distribution of national brand products.

It is important here to state what this proceeding might have been, but was not. It was *not* a contempt proceeding against the enjoined "core" defendants. It was *not* an informal application to re-open the issues as against the "manufacturer/suppliers" held in abeyance after the first injunction. In fact, counsel for plaintiff released each of them from this proceeding. It was *not* a proceeding against Met, either on a contempt theory, or as an added party defendant, although either procedure would have probably presented a far more viable mode of relief had the plaintiff prevailed.[11]

The plaintiff, instead, filed a submission which contained an unfocused prayer for "further injunctive relief" and scattered invocations of a multitude of conclusory allegations sounding in antitrust against all of the forty-plus defendants.[12]

Given this vague showing, it is doubtful that this Court would have proceeded

to the hearing which ensued but for sworn factual allegations that the Co-op's supplier, Met Food, was eliminating items which are major food staples in low-income family diets; and that it had "gone for weeks at a time without a can of sweet potatoes, tomatoes, peaches, apple sauce, salmon, tuna fish, or rice in our supermarket." Harris Affidavit in Support of Motion, Oct. 24, 1973, ¶ 4. Also, plaintiff's Treasurer filed an affidavit which described a shopping trip to competitors' stores during which she purchased 49 items which the Co-op was unable to get from Met Food during the same week. This provided factual support for the allegation that discrimination was occurring. Glenn Affidavit in Support of Motion, Oct. 24, 1973, ¶¶ 4, 5.

Further, this Court was not unmoved by plaintiff's predictions that if the alleged discrimination did not stop, the Co-op would go out of business while this action was pending ultimate jury determination of the merits. And finally, the Court was mindful of the admonition of the Supreme Court that

[T]he purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws.[13]

For all of these reasons, the Court determined to proceed to a hearing to give

firmed the convictions of their co-defendants. United States v. Overton et al., 470 F.2d 761 (2d Cir. 1972), cert. denied, 411 U.S. 909, 93 S.Ct. 1528, 36 L.Ed.2d 200 (1973). Solomon and Kaufman are presently involved in bankruptcy proceedings in this court.

11. It cannot be said that counsel for plaintiff was unaware of these options. The letter of May 25, 1973, note 8, *supra*, warned defendants that . . .

We have advised Harlem River of the available remedies including, inter alia, contempt proceedings, the extension of the injunction, the amendment of the complaint so as to include additional defendants and to recover additional damages sustained as a result of the apparently continuing and expanding conspiracy to drive Harlem River out of business.

12. There was a serious question raised as to whether or not the allegations in the complaint were sufficient to support this motion charging somewhat different violations of the antitrust law, occurring long after the complaint was filed. This Court determined that the complaint was sufficient against all the defendants named in the proceeding "in this age of 'notice' pleading," particularly when the new violations were said to be part of the continuing conspiracy. Checker Motors Corp. v. Chrysler Corp., 283 F.Supp. 876, 881 (S.D.N.Y.1968), aff'd, 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S. Ct. 1595, 22 L.Ed.2d 777 (1969).

13. Zenith Corp. v. Hazeltine, 395 U.S. 100, 130–131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969).

plaintiff the opportunity to develop, if it could, the various factual allegations into a coherent showing of a conspiracy in restraint of trade.[14]

### The Plaintiff's Burden of Proof

■ A party seeking a preliminary injunction assumes the burden of demonstrating either a combination of probable success on the merits and the possibility of irreparable injury, or that it has raised serious questions *going to the merits and the balance of hardships tips sharply in its favor.* Stark v. New York Stock Exchange, Inc., 466 F.2d 743, 744 (2d Cir. 1972), citing Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

It must be acknowledged that because of the parties which plaintiff chose to join, and more importantly chose not to join in the hearing, it faced a formidable, albeit self-appointed evidentiary task.

■ Met Food is a non-defendant in this action, yet plaintiff's only reasonably well-pleaded theory going to the merits 'was based on Met's alleged discrimination. Even if plaintiff had proved that Met was guilty of the rankest discrimination against plaintiff, this Court would have been powerless, given the present posture of the case, to act against such discrimination without a further showing that Met Food's acts could be characterized, legally, as being done with the knowledge of and the encouragement of the defendants.

■ If plaintiff proved both the discrimination and a conspiratorial relationship, then and only then, could this Court have formulated any remedy at all. And even then the form and effectiveness of such relief would have depended upon the strength and the thrust of the evidence. Only if plaintiff could show an extraordinary identity of purpose between Met Food and the defendants would this Court have the power to directly order Met Food, a non-defendant, to cease its discrimination. See, Zenith Corp. v. Hazeltine, 395 U.S. 100, 110–112, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Dino DeLaurentiis Cinematografica S.p.A. v. D–150, Inc., 366 F.2d 373, 376 (2d Cir. 1966), rev'g 258 F. Supp. 459, 464 (S.D.N.Y.).[15] Given a lesser showing with respect to the conspiratorial relationship, this Court would have been limited to measures addressed solely to the defendants named in the new proceeding. Against them, the Court could have enjoined any new acts calculated to interfere with plaintiff's business;[16] or modified the existing injunction to meet changed conditions;[17]

---

14. Thus, this Court's Order of Oct. 31, 1973, stating that the hearing would proceed, set forth the following:

> While serious questions have been raised as to whether plaintiff has the proper parties before the Court in order to proceed on its theory with respect to the impact of non-defendants in this action, it will be given the opportunity to present evidence on the question of whether or not the relationship among the defendants . . . and between these defendants and non-defendants is such that an expansion of the existing injunctive order is required both as to relief and as to defendants enjoined . . . The Court's focus, during these hearings, will be on whether or not there is, in fact, a change from the status quo achieved by the injunctive order of November 17, 1970, and if so, whether or not the proof indicates, consistent with the standards for prelimi-

nary relief, that any of the defendants named are responsible for the change in contravention of the antitrust laws.

15. It is important to note that Met Food Corp., had full notice of the pleading in this proceeding, and that its representatives were frequently in court during the hearing, and that its documents form the basis for some of plaintiff's proof and much of the defendants' opposition to the motion. The fact that Met Food was not named as a party in the action does not, of course, prevent the showing of its complicity in the alleged conspiracy. See, e. g., Eagle Lion Films, Inc. v. Loew's Inc., 219 F.2d 196, 199 (2d Cir. 1955).

16. Pursuant to this Court's general equity powers and by the authority of Section 5 of the Clayton Act, 15 U.S.C. § 16.

17. See, United States v. United Shoe Corp., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562

or restrained any effort to coerce plaintiff into discontinuing the lawsuit.[18] It is possible that any of these remedies directed at the defendants could have bound Met Food, but only indirectly as an unnamed entity acting in concert with the named defendants. Fed.R.Civ. P. 65(d). See, e. g., Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 13–14, 65 S.Ct. 478, 89 L.Ed. 661 (1945); Alemite Manufacturing Corp. v. Staff, 42 F.2d 832, 833 (2d Cir. 1930).[19]

Thus, the plaintiff's burden in this proceeding was a complex one. To prevail at all and to achieve meaningful relief, the Co-op had to show, at a minimum, that there was discrimination against it and further, that such discrimination was the objective of an unlawful conspiracy, controlled by the defendants, and aided and abetted by Met Food.

*Discrimination*

As a general proposition, the antitrust laws exist "to protect competition, not competitors." Checker Motor Corp. v. Chrysler Corp., 283 F.Supp. 876, 885 (S.D.N.Y.1968), aff'd, 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). See e. g., United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 220–221, 60 S. Ct. 811, 84 L.Ed. 1129 (1940). This means that a company is entitled to sell or not to sell to any customer, or to sell as much as it sees fit, unless such actions are accompanied by unlawful discrimination within the meaning of Sec-

tion 2 of the Clayton Act, as amended by Section 1 of the Robinson-Patman Act, 15 U.S.C. § 13; or accompanied by an unlawful agreement within the meaning of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; or conceived in monopolistic purpose or for market control within the meaning of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. See, e. g., Times-Picayune v. United States, 345 U.S. 594, 625, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir.); cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2d Cir. 1962); Beckman v. Walter Kidde & Co., Inc., 316 F.Supp. 1321 (E.D.N.Y. 1970), aff'd, 451 F.2d 593 (2d Cir. 1971), cert. denied, 408 U.S. 922, 92 S. Ct. 2488, 33 L.Ed.2d 333 (1972); Schulman v. Burlington Industries, Inc., 255 F.Supp. 847 (S.D.N.Y.1966). Thus, it is not necessarily a violation of the antitrust laws when a supplier allocates, or in any other way attempts to exercise control over which of its customers will receive how much of its products. Banana Distributors, Inc. v. United Fruit Co., 162 F.Supp. 32 (S.D.N.Y.1958) rev'd on other grounds, 269 F.2d 790 (2d Cir. 1959); Independent Iron Works, Inc. v. United States Steel Corp., 177 F. Supp. 743 (N.D.Calif.1959), aff'd, 322 F.2d 656 (9th Cir.), cert. denied, 375 U. S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

Although plaintiff is not in a procedural posture to obtain relief against Met Food alone for unlawful discrimina-

---

(1968). Cf. King-Seeley Thermos Co. v. Aladdin Industries, Inc., 418 F.2d 31 (2d Cir. 1969).

18. In this event the Court could have exercised its general equity powers "akin to an exercise of [its] contempt power for the purpose of protecting the integrity of the judicial system." House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867, 871 (2d Cir. 1962). See, Bergen Drug Co., Inc. v. Parke, Davis & Co., 307 F.2d 725 (3d Cir. 1962).

19. This line of cases deals, generally, with contempt situations. It would be applicable here only if the Court issued a new or modified injunction and plaintiff could show in a later contempt proceeding that Met Food had received actual notice of that order by personal service or otherwise, and was acting in concert with the freshly enjoined defendants in violation of the order. Fed.R. Civ.P. 65(d).

tion under the Clayton Act, some of the requirements of proof set forth therein are useful here to define "discrimination." Section 13(e) of the statute deals with discrimination in delivery services. See, Centex-Winston v. Edward Hines Lumber Co., 447 F.2d 585 (7th Cir. 1971), cert. denied, 405 U.S. 921, 92 S. Ct. 956, 30 L.Ed.2d 791 (1972). Section 13(a) deals with discrimination that is more directly related to price differentials, such as differences in terms and conditions of sale. See, Corn Products Co. v. FTC, 324 U.S. 726, 740, 65 S.Ct. 961, 89 L.Ed. 1320 (1945). The prima facie case of discrimination (as well as the defenses to such a case) differs somewhat under these two subsections. See, FTC v. Simplicity Pattern Co., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959). But both require, at the threshold, proof that plaintiff is in competition with other supermarkets which have received favorable treatment, on reasonably contemporaneous sales, of goods of like grade and quality, from the same supplier. See, Centex-Winston v. Edward Hines Lumber Co., supra; FTC v. Borden Co., 383 U.S. 637, 86 S. Ct. 1092, 16 L.Ed.2d 153 (1966).

Plaintiff's proof virtually ignored these fundamental elements of "discrimination." Instead, it concentrated on the unilateral treatment it had received from Met Food, and upon the damage such treatment had inflicted upon plaintiff.

Thus, testimony of plaintiff's expert witnesses, and testimony elicited from defendants' officers who were called to the stand by plaintiff, demonstrated beyond question that an adequate supply of national brand products is the lifeblood of a supermarket the size of the Co-op. If such products are out-of-stock with any regularity, even loyal, involved customers eventually turn elsewhere. Further, the testimony of these witnesses plus that of the plaintiff's President, its Store Coordinator, and its Treasurer, demonstrated that carefully timed order-

ing of a carefully determined quantity of supplies is essential to the cash flow, and thus, to the successful operation of a high-volume, fast-turnover food retail business. A necessary corollary is that the goods ordered must be delivered, in full and when expected. If the delivery is incomplete or late, in addition to the damage to customer relations, the supermarket's work schedule is disrupted and the cash flow diminished.

Plaintiff also proved to this Court's satisfaction that during the relevant period Met Food's weekly deliveries to the Co-op entirely omitted a portion of the items ordered for that week, and failed to include other items in the amounts ordered.

The procedure by which plaintiff placed its orders with Met Food was not disputed and is a common one in the industry. Plaintiff's Store Coordinator telephoned the weekly order to a Met Food order clerk approximately five days prior to expected delivery. That clerk keypunched a tape which was fed into Met's computers. These computers are programmed to print-out an invoice of items to be delivered and a separate list of items ordered which are purportedly out-of-stock or which the wholesaler is rationing among customers because of short supply. It is not contested that the total of these two lists, the delivery invoice and the "scratch list" (in the parlance of the trade) represents the order called in by the customer. Sets of these documents are the most reliable evidence of Met's dealings with plaintiff. The delivery of October 16, 1973, which was the event which apparently propelled this motion from the talking to the action stage, will serve as an example of the evidence underlying the Court's conclusion that plaintiff's orders were not filled completely, and that national brand products were prominent among the items "scratched."

Adding together the items on the delivery invoice for that week (Local 338,

Exh. L) and the "scratch" list of that week (Pl.Exh. 68–C), it appears that plaintiff ordered a total of approximately 1279 cases (representing some 903 items, counting several sizes of the same product). About 1032 cases were delivered (representing about 733 items), leaving about 19% of plaintiff's case order "scratched". Of the items scratched or rationed, about 30 have been identified during the hearing as items "critical" to plaintiff's business.[20] An examination of the documents for other weekly deliveries reveals essentially the same pattern, although the "scratch" percentages range from 10% (Aug. 28, 1973) to 11% (Sept. 24, 1973) to the 19% scratched on Oct. 16, 1973, and back to 13% (Oct. 23, 1973) at the end of the relevant period. Although these figures do not evoke an image of shelves as bare as did the papers supporting this motion, and although the documents do not reveal that plaintiff went for weeks without a single can or box or bag of any particular item, they do present an overall pattern which this Court does not doubt has caused damage to plaintiff's business.[21]

But harm, alone, does not demonstrate a violation of the antitrust laws. See, e. g., Ace Beer Distributors, Inc. v. Kohn, Inc., *supra*, 318 F.2d at 287. Plaintiff must also show that it is being harmed while its competitors, served by the same supplier, are being favored in violation of the antitrust laws.[22]

Met Food's delivery invoices and "scratch" lists for several other of its customers in the "Harlem target area" are also in evidence.[23] The following comparative chart outlines the "scratch" record for plaintiff and five of those competitors for two separate weeks during the relevant period.

---

20. The "critical" category had its genesis in the list of 49 items which plaintiff claimed were "scratched" in the delivery of Oct. 16, 1973, but were available in competing Met-serviced stores. The parties agreed that at least 43 of these items were national brand products and therefore, "critical." The Court has concluded from a comparative study of the documents related to that order that 30 of the 43 items were actually ordered by the Co-op and "scratched" by Met. Plaintiff's figure is higher because its list appears to have erroneously included some items in sizes that were actually delivered, but has failed to include the same items in sizes that were ordered and not delivered. In any event, the 30 items "scratched" are sufficient to prove plaintiff's point.

21. Although it is not necessary to decide here, it should be noted that cross-examination of some of plaintiff's operating personnel indicated that they could have taken measures which might have alleviated the impact of the short supplies of some items. To that extent, the "scratches" cannot be said to be the sole reason for the drop in plaintiff's revenues during the relevant period.

22. Plaintiff's effort to do so, with the comparative shopping trip of Oct. 20, 1973, described in the Glenn Affidavit of Oct. 24, 1973, was minimized when it developed during the hearing that one of the two stores shopped was not, at that time, a Met customer, and the other was outside the "Harlem target area." Furthermore, Met's delivery documents with respect to the latter indicate that 18% of the cases it ordered on Oct. 16, 1973, were "scratched" by Met.

23. These competitor-customers of Met Food are an entirely different group of individual stores, unrelated to any defendant "competitor" in this action, or to each other. No competitor-customer is a party to this action; and no defendant "competitor" in this action is presently serviced by Met Food.

### Week of August 27, 1973

|  | Cases Ordered | Out-of-Stock | Rationed | Percent Scratched |
|---|---|---|---|---|
| The Co-op, order dated 8/28/73 | 1,432 | 135 | 11 | 10% |
| Cherrie Retail Corp., 8/31/73 | 832 | 62 | 2 | 7% |
| Food City, Inc., 8/28/73 | 675 | 147 | 8 | 23% |
| 8/31/73 | 404 | 127 | 11 | 34% |
| Food Pageant, Inc., 8/28/73 | 430 | 57 | 3 | 14% |
| 8/30/73 | 984 | 115 | 14 | 13% |
| Sureway S/M Inc., 8/29/73 | 737 | 95 | 7 | 13% |
| Teitler Benjal Food Corp., 8/29/73 | 1,616 | 217 | 30 | 14% |

### Week of October 15, 1973

|  | Cases Ordered | Out-of-Stock | Rationed | Percent Scratched |
|---|---|---|---|---|
| The Co-op, order delivered 10/16/73 | 1,279 | 232 | 15 | 19% |
| Cherrie Retail Corp., 10/19/73 | 750 | 68 | 1 | 9% |
| Food City, Inc., 10/15/73 | 982 | 149 | 20 | 17% |
| Food Pageant, Inc., 10/16/73 | 672 | 134 | 3 | 20% |
| 10/18/73 | 926 | 83 | 8 | 9% |
| Sureway S/M Inc., 10/17/73 | 1,004 | 75 | 4 | 8% |
| Teitler Benjal Food Corp., 10/17/73 | 1,572 | 148 | 7 | 9% |
| 10/19/73 | 406 | 41 | 5 | 11% |

These charts reflect two facts which may be fairly inferred from the whole of Met Food's records. First, there is no apparent pattern of discrimination against any particular customer. Throughout the period in question, the Co-op and its competitors have each sometimes suffered large percentage scratches, and at other times, lesser percentage scratches. Thus, the fact that the Co-op's order of Aug. 28, 1973 was "scratched" 10%, while Teitler's order of Aug. 29, 1973 was "scratched" 14%, does not indicate that Teitler was in disfavor. Nor does the 19% "scratch" factor in the Co-op's Oct. 16, 1973 delivery as against Teitler's 9% and 11% for each of its orders of that week, show that Teitler was being favored.[24] The shifting positions of the various competitors is more likely attributable to such variables as Met's constantly revolving

24. These week to week variations tend to even out over the period, as demonstrated by the "scratch" percentages of the week of Sept. 10, 1973: The Co-op, 17%; Cherrie, 15%; Food City, 21%; Food Pageant, 26% and 16%; Sureway, 16%; Teitler, 15%.

inventory, and the fact that supermarkets do not carry precisely the same brands, do not order precisely the same items each week, and do not necessarily require the same quantities of the same items on the same schedule. Further, they do not order with the same frequency, or on the same day. Therefore, the second fact which can be inferred from these figures is that during the relevant period all of Met's customers could expect their orders to be scratched, regardless of the variables, at a minimum of around 10%; and that the risk, depending upon the variables, ran upwards to 20% and higher. The underlying documents also indicate that each store could expect and did receive an incidence of "scratched" "critical" products comparable to plaintiff's.

■ Other evidence elicited from plaintiff's witnesses strengthens this Court's conclusion that Met Food has not been systematically discriminating against plaintiff or any other customer discussed at this hearing. In fact, it would appear from the evidence adduced thus far that Met Food is systematically attempting to make the best of a bad situation which is not of its own doing.[25]

Thus, plaintiff's own experts testified that food shortages had been forecast for 1973 since the beginning of the year, and that the food manufacturers reacted to price controls by withdrawing products from the market, and that the effects of both were felt across the nation in the late summer and early fall of 1973. Defendants' officers called by plaintiff during this hearing testified that they were experiencing the same supply difficulties as plaintiff with respect to essentially the same national brand products. For example, Richard Grimson, Mid-East's buyer, testified that Del Monte peaches had been withdrawn by the manufacturer three times during 1973 and were still on allocation. He testified that his company (a co-op wholesaler) ran out of Comet Cleanser in August and September; and that Motts Apple Juice was scratched and/or on allocation from July until October; and that five varieties of Bumble Bee Tuna had been scratched during the last six months because of cannery strikes, train derailments and the price freeze; and that Gold Medal Flour was on allocation during the summer; and that deliveries of Zest and Ivory Soaps were disrupted because the manufacturer changed the formula and the pack. Finally, with respect to the item which became, during the hearing, the focus of plaintiff's grievance—Carolina Rice—he testified that it had been withdrawn from the market in the middle of August.

Plaintiff called Robert Collins, of Riviana Foods, the Carolina Rice manufacturer, to the stand. On cross-examination he testified that his company had failed to deliver adequate supplies to Met and other wholesalers on a number of occasions from August 1, 1973 to October 15, 1973. He cited two major reasons. First, he said that weather conditions had delayed the harvest of the 1973 late summer crop; and, further that a world-wide rice shortage during the year had diverted substantial quantities to the export market, thereby depleting the supply in this country. He asserted that the supplies of rice in 1973 had dwindled to the lowest level recorded in twenty-five years.[26]

In conclusion, it would seem that the entire food industry operated on short

---

**25.** Plaintiff's allegations with respect to the late delivery over the Columbus Day holiday were never supported sufficiently to lead this Court to believe that the incident was any more than an inadvertent misunderstanding for which the plaintiff and Met Food share equal responsibility. In any event, there is authority for the proposition that with respect to at least some forms of discrimination, plaintiff is required to show that there was a pattern, not just an isolated event. See, e. g., International Film Center, Inc. v. Graflex, Inc., 427 F.2d 334 (2d Cir. 1970).

**26.** Of some interest is a recent report citing these same economic and meteorological occurrences during 1973 for the current rising price of rice. See, N.Y. Times, Feb. 4, 1973, § 1, at 25, Col. 1.

supplies during the period relevant to this hearing, and that its competitors fared no better than the Co-op. Thus, plaintiff has not met its burden of showing any probability of ultimately prevailing on the merits with respect to the issue of discrimination, as it has been raised in this hearing.

### Conspiracy

This Court is cognizant of the difficulty faced by a litigant attempting to prove that others have conspired to restrict or to destroy its business. Such arrangements, as the Supreme Court has said, "are seldom capable of proof by direct testimony, and may be inferred from the things actually done . . . ." Eastern States Retail Lumber Dealers' Assoc. v. United States, 234 U.S. 600, 612, 34 S.Ct. 951, 954, 58 L.Ed. 1490 (1914). Thus circumstantial evidence is entirely proper and often necessary in antitrust cases. It is not necessary that simultaneous actions or written agreements be proved. See, e. g., Interstate Circuit, Inc. v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610 (1939). The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in words. American Tobacco Co. v. United States, 328 U.S. 781, 809–810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

This evidentiary principle applies with particular force where, as here, the plaintiff seeks not final judgment, but preliminary relief; and where, as here, plaintiff is a small, independent company with limited resources and the defendants are larger, well-established companies, some with complex corporate structures. Further, it is pertinent that this proceeding is not being written on an entirely clean slate. A judge of this court has already found evidence sufficient to preliminarily restrain some of the "core" defendants from conspiring to interfere with plaintiff's busi-

ness. Of course, the means alleged in the prior proceeding, and the principals held responsible there, are different from the means and, to some extent, the principals here. And, the prior decree does not necessarily serve as a basis for inferring that the conspiracy found to then exist has continued. Cf. Webster Rosewood Corp. v. Schine Chain Theatres, Inc., 263 F.2d 533, 535 (2d Cir.), cert. denied, 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959). Nonetheless, this Court cannot ignore plaintiff's contention that it is facing essentially the same conspiracy in a new guise, even though it remains plaintiff's burden to prove that assertion. Id.

For all these reasons, the Court gave plaintiff great latitude in its attempt to meet its burden with respect to a continuing or a new conspiracy.

It is elementary that to prove a conspiracy the plaintiff must show, first, that there was an agreement between at least one of the named defendants and Met Food, with an unlawful purpose to restrain trade; and, second, with respect to each defendant named, that such defendant knowingly participated in the agreement.

Plaintiff's moving papers suggested that it would present evidence from which this Court could infer an unlawful conspiracy and the participation of Met Food and other defendants. Such evidence, plaintiff asserted, would speak to: Met Food's discriminatory treatment of plaintiff; the ability of some of the "competitor" defendants to obtain volume-based direct shipments from national brand manufacturers while plaintiff, because of its single unit status, was relegated to a limited number of voluntary wholesalers such as Met Food for its supply of national brand dry groceries; interlocking corporate directorates of the defendants; the trade association connections between the defendants; the desertion of some of plaintiff's employees; and an instance of po-

lice harassment of one of plaintiff's employees.[27]

At the subsequent hearing, plaintiff offered fragments of testimony, exhibits and prior depositions, each generally aimed at some portion of plaintiff's allegations, but which fell short of, or glanced off, the mark. For instance, evidence has been adduced that defendant Theodore Solomon, Executive Director of AGH "knows" Harry Lefkowitz who is presently employed by Met Food and who was president of AGH "prior to closing his Harlem store about the same time plaintiff opened its business in 1968." Other evidence indicates that prior to 1970, Met Food was the supplier for defendant Sloan's Supermarkets, Inc., until Sloan's switched its account to another supplier for better service. Plaintiff has also shown that a Green & White Supermarket in Harlem which is supplied by defendant Associated Food Stores, Inc. (a voluntary wholesaler like Met), is run by Joseph Sloan and Irving Sloan who are brothers of Max Sloan, president of defendant Sloan's. Further, it appears that Max Sloan's daughter is married to Stephen Karsh, employed by defendant Sloan's, who is the son of Sam Karsh, president of defendant Local 338. There is also evidence that defendant Sloan's once owned stock in a food wholesale business, Twin County Grocers, Inc., and that Irving Sloan was associated with one of defend-ant Pioneer Food Stores affiliates a few years ago. Evidence has been adduced that defendant Mid-East and defendant Pioneer have warehouses down the street from each other in New Jersey, and that defendant Solomon encouraged defendant Rosenblum to buy one Harry Taxon's share of CCS just prior to the 1969 strike and that Harry Taxon was once connected with defendant Shopwell, Inc.[28]

It is also clear that most of the defendants belong to either or both the New York State Food Merchants Association and the Food Trade Alliance; and that officers of several of the defendants have served at one time or another as officers of those trade organizations. Further, it has been demonstrated that most of the retail stores serviced by Met Food in the Harlem target area are members of defendant Solomon's AGH; and that most of the retail operations involved in this hearing negotiate with the same union, defendant Local 338.

It is not entirely impossible that this colloidal mass could be formed into an evidentiary foundation for inferring participation in a surreptitious agreement, but an agreement is of no consequence if plaintiff has not shown what the agreement is, and that it is in restraint of trade. Cf. Ace Beer Distributors, Inc. v. Kohn, Inc., *supra*, 318 F.2d at 286.

27. Plaintiff's moving papers appeared to assert some of these factual conclusions as separate objectives of the conspiracy and as separate bases for relief. For instance, plaintiff's early allegation against the national brand manufacturers, none of which are defendants in this action, sounded as if the plaintiff was attempting to assert an illegal boycott in violation of the Sherman Act. Plaintiff did call a manager of General Foods to the stand, but the testimony elicited did not advance plaintiff's theory, and its other efforts along these lines were so incomplete and vague that it must be deemed to have abandoned the theory. The same conclusion must be drawn with respect to the other allegations set forth as possible separate violations of the antitrust laws. However, the proof that was adduced with respect to these allegations, if any, has been carefully weighed in the conspiracy equation.

28. Most of these items have been offered in the form of transcripts from prior depositions by plaintiff of defendants' officers. Defendants have objected to the admission of much of this material and many of their objections are valid. However, this Court has taken much of the evidence in this proceeding subject to connection. It has admitted all of the depositions offered by plaintiff subject to the same qualification.
Since this Court has found no conspiracy, there has been no connection. No evidentiary ruling from this hearing shall have any force or effect against the defendants in any future proceeding in this action.

All the plaintiff has shown, in rather broad strokes, is that people involved in the food industry in Harlem tend to know each other; that they tend to belong to the same trade associations; and attend the same trade conferences; and that their clerks are represented by the same union; and that the retailers who, like plaintiff, must depend upon wholesalers for their dry grocery supplies, tend to change from supplier to supplier as often as plaintiff does, for the same business-oriented reasons.

In other words, plaintiff has shown that the food industry in Harlem is most likely a community of many common interests and goals. But it has not introduced a scrap of evidence from which this Court could infer that one of those interests and goals is to put plaintiff out of business, or to form an oligopoly to control the Harlem market.

### Conclusion

■ Plaintiff has shown that national brand products are critical to its business. It has shown that its major supplier of these products has failed to deliver all that it has ordered during the period relevant to this motion for preliminary relief. It has shown that the "scratches" of such products has caused a crisis for the hard-pressed Co-op. It has offered little else except suspicions and hope.

Given the past history of the Co-op's frustrations and the relief granted by this Court in a prior proceeding, it is not an incredible leap in reason for plaintiff to have supposed that the defendants and Met Food were somehow responsible for its problem and that somehow a new interlocutory hearing in this Court might produce a solution. But, supposition and hope and a past court victory, based on a wholly different set of facts, are not evidence. On the evidence produced at this hearing, viewing it from a perspective most favorable to the plaintiff, this Court finds that there is little probability that plaintiff could ultimately prevail on the merits with respect to the issues raised here

as against the defendants named here; nor has plaintiff raised any serious legal or factual questions going to the merits. Certainly plaintiff has not made a showing which would justify an injunction against a non-defendant which, in effect, would cause it to discriminate against its other customers in favor of the Co-op.

Based on these conclusions, this Court grants defendants' motion to dismiss plaintiff's motion for injunctive relief at the end of plaintiff's direct case. Plaintiff's motion for further injunctive relief is hereby denied.

The foregoing shall constitute this Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52 (a).

So ordered.